Davis, Judge,
delivered the opinion of tbe court;
Plaintiff is a dentist who served in the Army Dental Corps from April 16,1942, to December 21,1944. In August 1942 he injured his back when be tried to extricate, under strenuous conditions, tbe bodies of two men from a wrecked airplane in England where be was then stationed. From that time on, be suffered recurrent back pain and difficulties. He was hospitalized in August-September 1943 (after a re-injury to tbe back), and also in October 1943 — witb diagnoses of sprain or strain. On bis return from overseas in June 1944 for reassignment under tbe rotation program, be was examined, hospitalized for a period, and again found to be suffering from back trouble of the same general nature. A preliminary finding was made that he was disqualified for overseas duty and was fit only for limited duty in tbe United *137 States. Being anxious to rejoin civilian life in order to take care of his family, he applied for release from active duty on the ground of hardship. This was approved, since his retention on active duty was not essential to the war effort, and he was separated on December 21, 1944, without appearing before a Retiring Board.
On taking up his practice, plaintiff found that, because of his continuing back trouble and pain, he had to curtail his work sharply. He installed a chair which moved on a trolley around the dental chair, making it unnecessary to bend forward from a standing position; he regularly called upon assistants to hand him instruments; and he had to take daily intermittent rest periods and was often forced to cancel appointments. He was under continuous medical care from 1945 on, receiving a variety of treatments which were unable to arrest his serious symptoms. Early in 1956 he suffered an acute exacerbation of his condition which led to his hospitalization, to the taking of a myelogram (an x-ray of the spinal cord) suggestive of a herniated disc, and finally to an operation which removed a large ruptured disc. This operation gave temporary relief but was largely unsuccessful. Plaintiff’s condition became considerably worse. He gave up his dental practice entirely and moved from upper New York State to the warmer climate of Florida. A second myelogram in 1958 again indicated a herniated disc.
In November 1958, plaintiff applied to the Board for Correction of Military Records for a finding that he was permanently incapacitated when he was separated in. 1944 — attaching his private and governmental medical records as well as pertinent affidavits and statements of doctors and others. In February 1959 the Correction Board, without ordering a hearing, notified him that insufficient evidence had been presented to indicate probable material error or injustice at the time of his release — and therefore that his application was denied. This suit was then commenced, and a trial has been had.
The first question is whether plaintiff’s suit is barred by limitations. He was released from active duty in December 1944 without disability retirement pay, and suit was not in *138 stituted until May 1959. But, as we have already indicated, he did not have or request a Retiring Board proceeding on or after his separation, and the first board to consider his claim for disability retirement pay was the Correction Board which denied all relief in February 1959. In these circumstances, his suit was timely under the rule, previously applied in Proper v. United States, 139 Ct. Cl. 511, and Patterson v. United States, 141 Ct. Cl. 435, that the cause of action for disability retirement pay does not accrue until action by the Correction Board where that tribunal is the first competent board to decide (or to be asked to decide) that the officer was entitled to such pay. See the discussion in Parts I, C, and II of the opinion in Friedman v. United States, decided this day, ante, p. 1.
It is true that plaintiff was offered a Retiring Board in 1944 but declined the proffer. In the circumstances present here,[1] this was not enough to ripen the claim. As pointed out in our opinion in the companion Friedman case, supra (as well as in earlier opinions), what is required for accrual of the cause of action is final adverse action by the Government — either through the denial by a competent board of disability retirement pay or by the service’s refusal to convene such a board on request — rejecting the serviceman’s right to disability pay. Under the retirement legislation, the obligation is normally on the Secretary to decide whether a serviceman should be retired for disability with pay (see present 10 U.S.C. 1201 (1958), and former 10 U.S.C. 456,931,933,961-65,971,34 U.S.C. 855c-l (1946); R.S. 1245-1251, 1274); the individual does not waive his claim by failing to apply before his release and, as the Correction Board statute shows, the service is not relieved of its obligation by his failure so to apply. Indeed, the pertinent regulation at the time (see finding 24) provided that officers *139 like Harper, recommended for limited duty, were to be sent before Retiring Boards as a matter of course. Since that was not done, Harper’s right survived administratively to and through the Correction Board proceeding and his judicial claim did not ripen until the end of that proceeding.[2] It is not necessary to determine whether plaintiff would have been precluded from recovery had he known at the time he declined the Retiring Board, or by ordinary diligence could have learned of, the serious nature of his ailment. Neither he nor the doctors fully knew the nature and extent of the disability until March 1956.
On the issue of the validity of the Correction Board’s denial of the claim, our Trial Commissioner has found that plaintiff was permanently incapacitated for active service at the time of his release to inactive duty in 1944 and that the Board’s refusal, in 1959, to find him so disabled was arbitrary and unsupported by substantial evidence. We accept and adopt those conclusions, and with some modifications the subsidiary findings upon which they are based.
When plaintiff left active duty in December 1944, he was having continuous discomfort and pain in his back and legs, accompanied by inability to move his legs freely, considerable difficulty in walking stairs, stumbling with his left leg, and limitation of motion even in ordinary walking; he had become nervous; he could no longer participate in sports; and it had been recommended that if retained in service he be kept only on limited duty. It may have been reasonable at that time to view these disabilities as resulting from nothing more than a sprain, strain, or muscular ailment which would not permanently incapacitate. But the progressive deterioration of his condition after his return to civilian life and the discovery, in 1956, of a herniated disc showed that in fact the true nature of his incapacity in 1944 was much more serious than a sprain or strain, and that the previous diagnoses were incorrect. On the basis of the material be *140 fore tbe Correction Board, plaintiff made out his case that he had suffered a herniated disc at the time of his accident in August 1942; that this spinal injury, which was aggravated by later occurrences, severely disabled him; that the physicians at that time and for years thereafter did not know that he had sustained this serious disability and misdiagnosed his ailment[3]; that the herniated disc which was at the bottom of his disabilities was discovered only in 1956; and that his disabilities stemming from that condition were severe and lasting, as shown most dramatically by his diminishing ability to continue his dental practice. The Board obtained no new evidence to the contrary. Nevertheless, it summarily denied him relief on the ground that the evidence was insufficient. In the face of the strong showing he made, this summary denial was arbitrary and the Board’s determination cannot be accepted as binding.
The facts proved at the trial in this court sustain and bear out the case made before the Board, and demonstrate anew the lack of support for the administrative determination that plaintiff was not permanently incapacitated on his separation. .The proof has shown that the herniated disc which was discovered in 1956 existed in 1944; and it was the cause of his difficulties in 1942-1944 and subsequently. At the time of his release, the official standards for retiring Army officers provided that a herniated disc “is usually considered incapacitating for general military service” (finding 17), and many officers were retired on that ground (finding 29). The Army’s regulations and rulings envisaged retirement for officers incapacitated for general service even though they were capable of performing limited service with the supply arms and services (finding 17). See, also, Weiner v. United States, 148 Ct. Cl. 445. In view of plaintiff’s symptoms and disabilities incident to his herniated disc, in 1944 and thereafter, it seems clear that he too should have been retired when he was released from active duty and that he would have *141 been retired if tbe true facts as to his condition had been known. It was incumbent on the Correction Board so to decide when the facts were presented to it.
The defendant stresses the fact that plaintiff obtained, in August 1945, a medical certificate from his private physician that he was physically qualified for the equivalent of a commercial pilot’s rating. This evidence cannot be accorded much weight. Neither Harper’s doctor nor anyone else knew at that time (only seven months after his separation) that he had a herniated disc; the view then was that he was still suffering from a back sprain or strain or comparable temporary ailment which would probably yield to treatment. Awareness of his ruptured disc, as well as the graver symptoms and consequences of his disability (including his being forced to reduce and finally to leave his practice) , were yet to come.
The plaintiff is entitled to recover disability retirement pay from the time of his release from active service, and judgment will be entered to that effect. The amount of recovery will be determined under Buie 38 (c).
Dureee, Judge; Laramore, Judge; Whitaker, Judge; and JoNes, Chief Judge, concur.
EINDINGS OE EACT
The court, having considered the evidence, the report of Trial Commissioner Paul H. McMurray, and the briefs and arguments of counsel, makes findings of fact as follows:
1. Plaintiff was bom October 6, 1908. He graduated from the University of Buffalo with the degree of D.D.S. June 13,1934. At the age of 26 he applied for appointment as a first lieutenant in the Dental Beserve of the Army. On April 9, 1935, a Board of Officers found him physically, morally, generally, and professionally qualified for this appointment, having been “favorably impressed” with plaintiff’s ideas as to moral character. He practiced dentistry in the Buffalo, New York, area for approximately 8 years prior to being called to active duty in 1942. Beginning in 1938, when his father retired from dental practice, plaintiff took over his father’s practice in Angola, New York.
*142 2. On March. 11, 1934, plaintiff was given a physical examination and found qualified for appointment as a first lieutenant with the Dental Eeserve of the Army. On October 9, 1941, and February 11, 1942, he was examined for extended active duty and found physically qualified for such duty.
3. On April 16, 1942, at the age of 33, plaintiff entered extended active duty as a first lieutenant, Dental Eeserve, Army of the United States. He was thereafter promoted to the rank of captain and served until December 21, 1944, when, pursuant to his application, he was relieved for dependency, undue hardship, under circumstances set forth in finding 8. Plaintiff held his reserve commission until April 1,1953, when he was honorably discharged from his commission by operation of law.
4. Shortly after entering active duty, plaintiff was sent to England, where he served as a dental officer, and, for a limited period in 1942, because of a shortage of medical officers, he rendered medical care for members of the 97th Bomber Group.
In August 1942, while removing bodies from a wrecked airplane, plaintiff injured his back, and received physiotherapy treatment for a period of 3 days at an English dispensary near Polebrook, England. Clinical notes concerning this injury and treatment state that he recovered and returned to full duty in one week. See also findings 19-20.
5. Plaintiff stated in an affidavit to the Board for Correction of Military Eecords that, after the accident in August 1942, his back pains recurred, and he resorted to self-medication and treatment whenever feasible. Clinical notes dated August 12, 1943, record that at Pon du Fáhs, North Africa, while removing lockers from a jeep, his back was caught in an awkward position, and he suffered sharp pain, causing him to become completely disabled. On August 25 he was sent to the 60th Station Hospital at Tunis, where physical examination disclosed a spasm of the lumbosacral muscles and inability to bend his back. The ward officer described plaintiff’s condition as a moderately severe strain of lumbo-sacral muscles, reinjured August 12, 1943. He received physiotherapy and was returned to duty on September 5, *143 1943, as improved. An X-ray of the lumbar vertebrae revealed no bony pathology, and the tentative diagnosis was “Sprain, recurrent, muscles and ligaments, lumbar region, moderately severe.” After receiving physiotherapy he was returned to duty improved, with no complaints and no limitation of back motions. See also finding 21.
6. On October 22, 1943, plaintiff was admitted to the 35th Station Hospital with a history of 3 months of mild, persistent diarrhea with acute exacerbations, weakness, general malaise, and weight loss of 33 pounds. The immediate cause of the hospital admission was an acute onset of abdominal cramps and loose, watery stools. Stool cultures and blood chemistry for evidence of dysentery were negative. These studies having revealed no amoebic or typhoid dysentery, plaintiff was sent to an orthopedic specialist for determination as to whether the injury to the back might have been responsible for the abdominal condition. X-rays were negative, and a diagnosis of old, recurrent back strain was made. Plaintiff was returned to duty on October 27 “feeling well.” See also finding 22.
7. In June 1944 plaintiff was ordered to the United States for reassignment, and was sent, for this purpose, to the AAF Kedistribution Station at Atlantic City, New Jersey. After X-rays of his lumbosacral spine on July 20,1944, and an examination at the Orthopedic Clinic of the Kedistri-bution Center on July 21,1944, plaintiff’s disability was diagnosed as a 2° reverse spondylolisthesis, sacrum, lumbar 5, symptomatic; and myositis, low grade, chronic, lumbar, secondary to the spondylolisthesis.
Subsequently plaintiff was transferred to the AAF Convalescent Hospital, Mitchel Field, New York, for observation, treatment, and medical disposition. He remained there from July 31 to August 28,1944. Following his admission, with a diagnosis of myalgia, bilateral, moderately severe, caused by back strain, he was given extended physical therapy treatment, but there was no improvement in his condition.
Upon his return to the Kedistribution Center, plaintiff was examined at the Orthopedic Clinic of the Office of the Surgeon. There had been no improvement in his symptoms and an examination revealed “no improvement in second de *144 gree reverse spondylolisthesis sacrum on lumbar 5tli. There is still present complete loss of the normal lumbar curve.” The orthopedic specialist stated:
Above pathology considered disqualifying for full military duty. Qualified for limited service only and permanently disqualified for overseas service. Application of low back brace may help this patient’s condition.
The plaintiff was also examined on September 2, 1944, by Lt. Col. Edw. C. Pallette, who reported a 2° reverse spon-dylolisthesis, sacrum on lumbar 5, symptomatic, disqualifying for full duty. A finding was made that plaintiff was disqualified for overseas duty and fit only for limited duty in the United States. See also finding 23.
8. During the period when plaintiff’s physical condition was being evaluated, he was also confronted with serious problems concerning members of his family in New York which required immediate attention. Plaintiff’s wife was admitted to Gowanda State Homeopathic Hospital November 4, 1941. The diagnosis was dementia praecox, paranoid type. There had been no improvement as of July 23, 1944, and prognosis was poor. Two of plaintiff’s three children, age 2 and 8 years, were living with his elderly father and mother near Angola; the third, age 4, was with a sister and brother-in-law, who had a family of their own. Plaintiff’s father had developed carcinoma of the colon, for which he was to have an operation. It appeared urgent that plaintiff return to his home as soon as possible.
On September 6,1944, plaintiff requested relief from active duty “for reason of dependency,” stating “immediate release from active duty is imperative so that I may provide for the proper care of my children and to assume the responsibility for the care of my father * * * [who must] undergo a serious operation.” The commanding officer of the AAF Redistribution Station recommended approval of plaintiff’s application, stating that he was “permanently disqualified for overseas duty and limited duty status recommended by Surgeon, this station” and that plaintiff’s “retention on active duty is not essential to the war effort.”
*145 Circular 408, War Department, October 14, 1944, entitled “Physical Declassification of Officers,” provided (par. 8), in-part as follows:
* * * an officer will not be retained in active duty in. a permanent limited duty status unless his services are certified as essential * * *
Plaintiff’s application for relief from active duty was approved and on December 21,1944, he was, following expiration of terminal leave, relieved from active duty for dependency, hardship reasons.
9. Plaintiff was advised that he had a right to appear before an Army Eetiring Board to evaluate his disability, but he was greatly concerned over the needs of his family and was anxious to effect a quick separation from the military service, and did not appear before such Board. He was informed that an Army Eetiring Board evaluation might have required additional lengthy hospitalization. He also felt that in civilian life, where he could control his physical activities, he might be able to “get along” with his recurring disability or possibly effect a cure. See also finding 24.
10. Plaintiff attempted to resume his practice of dentistry at Angola, but found from the beginning that he could not conduct a full-time practice. He required daily intermittent rest periods and restricted physical activities. Standing and working at his dentist chair, despite accessory aids, was an ordeal. See also findings 25-26. To carry on, even in a limited way, he required medical care and therapy. Although plaintiff has stated in an affidavit to the Board for Correction of Military Eecords that immediately following his separation he received regular physiotherapy treatments and medication at the office of Dr. Fred S. Diefendorf of Angola, it is shown by a medical certificate signed by Dr. Diefendorf on August 8, 1945, that plaintiff continued to meet the physical requirements prescribed for a Second Class Medical Certificate. This was in connection with the renewal of a Second Class Airman’s Certificate (private pilot) which plaintiff had been given over a period of years prior to World War II service. The record does not disclose what *146 type of physical examination plaintiff was actually given at that time, but the physical requirements established by the Civil Aeronautics Administration were the same as for a commercial pilot rating.
From April 1946 to 1954, plaintiff was under the regular and continuous care of Dr. Paul LaDuca of Angola. In a report submitted to the Correction Board, dated February 3, 1959, Dr. LaDuca stated that when he examined plaintiff in 1946, he had a “markedly rigid back with tender points at the level of the 4th and 5th vertebrae.” The physician then made a diagnosis of severe lumbar strain, chronic, with possible disc involvement. Dr. LaDuca stated that all of the relief plaintiff obtained from the treatment was temporary. See also finding 27.
From August 1954 to July 1958, Dr. Franklin Meyer of Eden, New York, treated plaintiff for his back condition. In a statement dated July 21, 1958, which was presented to the Correction Board, Dr. Meyer said that, in spite of injections, bed board, change of mattress, pelvic traction, corrective exercises, B-l, prostig, hydrocortone, vasocortone, and the entire gamut of medical and physiotherapy treatment weekly and oftener, he was unable to arrest plaintiff’s symptoms. His conclusion at that time was “total disability * * * bilateral post-surgical recurrence protruded interver-tebral disc, L-4 and L-5.” See also finding 27.
11. Plaintiff did not apply to the Veterans Administration for assistance until 1950. Although stating that no continuity was shown, the Veterans’ Administration found that plaintiff’s back disability was service-connected. The radiographic report was negative, and the condition was diagnosed as low back strain, chronic, recurrent. He was assigned an initial rating of 10 percent. Other subsequent ratings ranged from 10 percent to 100 percent, with a final evaluation of 60 percent, effective January 13, 1959.
12. On February 18, 1956, plaintiff had an acute exacerbation of his condition, and was treated by Dr. Meyer with heat lamps, sedatives, opiates, and physiotherapy without relief. On February 23 plaintiff was admitted to the Veterans Administration Hospital at Buffalo, New York, “acutely ill” with severe pain in lower back. No definite *147 findings were revealed by physical examination or X-rays. A lnmbar spinogram taken for the first time March 2, 1956, revealed:
* * * There was a rather marked bilateral defect at the level of L 4 and L 5. This is visible in all projections * * *. The defect on the left appears to be slightly larger than that on the right, however, the defects are so large bilaterally as to suggest a midline or close to mid-line lesion. * * * Impression: Herniated intervertebral disc L 4r-5 level. * * *
On March 6,1956, an excision of a large ruptured disc was accomplished by the attending neurosurgeon. The patient went on a 30-day leave March 14, 1956. The interim diagnosis was “Herniated disc, level of L 4 and L 5. Operated and improved.” See also findings 27-28.
Because of the discovery of the herniated disc, the Veterans Administration changed its diagnosis from “Previously Diagnosed Low Back Strain” to “Herniated Disc” and raised the disability rating to 60 percent, effective February 23, 1956. This was reduced to 20 percent, effective August 14, 1956. The final rating was 60 percent, effective January 13,1959.
13. The operation performed on plaintiff was unsuccessful. Except for a short period of temporary relief, plaintiff’s condition became considerably worse.
Following the operation, plaintiff gave up his dental practice entirely. He was advised to reside in a warm climate to achieve greater comfort and mobility, and he moved to Florida, where he was again hospitalized at the Veterans Administration Coral Gables Hospital on January 13, 1958. A second myelogram,[1] taken on January 16,1958, showed “a large defect between L4 and L5.” Clinical Record dated February 14, 1958, shows “Diagnosis: 1. Herniated interver-tebral disc, bilateral, LA-L5, treated, unchanged. * * *”
14. Plaintiff having learned, as a result of his operation and the myelogram, the nature of his disability, applied to the Army Board for the Correction of Military Records to *148 have bis records corrected to sbow that he was permanently incapacitated for active service at the time he was separated from active service. He attached to his application a six-page affidavit, a narrative summary of the findings of the Coral Gables Veterans Administration Hospital, statements of Dr. Meyer and Dr. LaDuca, and a statement of a fellow officer who shared his quarters during practically his entire tour of duty, was present at the scene of the crashed plane when plaintiff’s injury was incurred, and observed plaintiff’s difficulties thereafter.
The facts reflected in the preceding findings are based on records of the Army and the Veterans Administration, plaintiff’s affidavit, and the statements of Dr. Meyer, Dr. LaDuca, and Mr. Pardue.
In his application plaintiff stated that he desired to call witnesses, including Dr. Meyer, to testify before the Board.
15. Plaintiff was not granted a hearing by the Correction Board or an opportunity to present his witnesses. On January 6, 1959, the Correction Board requested the Surgeon General to review plaintiff’s military and medical records and furnish a comprehensive opinion for the guidance of the Board regarding the medical issue, and, if appropriate, to express an opinion as to the advisability of applicant’s appearance before a medical or physical evaluation board.
On January 80,1959, Col. Harold E. Opsahl, of the Physical Standards Division, Surgeon General’s Office, stated that plaintiff was considered qualified to perform limited duty in 1944. He further expressed the opinion that''plaintiff “presented no physical incapacity which would have warranted his retirement for physical disability under the rules, laws, regulations and policies in effect at the time.”
16. On February 26, 1959, the Correction Board notified plaintiff that the evidence before it was insufficient to indicate probable material error or injustice, and that his application was denied. The Board made no other findings at that time, nor did it give any specific reasons to support its conclusion. It informed plaintiff that, in the absence of new and material evidence tending to show the existence of error or injustice in the military records, further consideration by the Board was not contemplated.
*149 17. Under the rules, laws, regulations, and policies in effect in December 1944 when plaintiff was released from active duty, an officer who suffered a herniated nucleus pulposus was not considered physically qualified for active service.
The Surgeon General’s Manual for Officers in the Disposition and Retiring Board Branch of the Physical Standards Division provided, at paragraph 36, page 14:
Herniation of nucleus pulposus is usually considered incapacitating for general military service. In some cases following surgery where the officer has no signs or symptoms, he may be found not incapacitated for active service and placed on six months temporary limited service with reexamination and reevaluation at the expiration of such period.
AR 605-250, March 28, 1944, paragraph 30, defined “incapacity” as a basis for retirement as follows:
Incapacity, character of, etc. — a. Character. — Incapacity for service by reason of physical disability relates to a permanant incurable disease, injury, or infirmity which prevents the reasonable fulfillment of the purpose of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation, orders, or custom of the service.
A similar definition of incapacity is contained in the War Department Technical Manual 12-245, October 1,1945, which was a codification of the regulations and supplementary rulings and instructions in effect throughout World War II. Paragraph 23 (b) and (c) and 60(a) (2) of the Technical Manual provided as follows:
b. The word “disability” as used in Section 5 of the act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Regular Army Officer personnel. Thus, what constitutes “mcapacity for active service” for Regular Army officers likewise constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when he is per *150 manently physically or mentally incapable of performing-full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, supra, by reason of being permanently incapacitated for active service.
*****
60. a. (2) * * * [A]n officer is permanently incapacitated for active service when he becomes permanently physically or mentally incapacitated for the performance of full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent a finding that he is incapacitated for active service. With respect to such an officer active service means general service.
See also finding 29.
18. The action of the Correction Board, in denying plaintiff a hearing and in denying his application, was arbitrary. The evidence before the Board tended to establish that plaintiff had suffered a herniated nucleus pulposus at the time of his accident; that the spinal injury severely disabled him; that the physicians at that time did not know that he had sustained this serious disability and diagnosed it only as muscular strain or sprain; that it was discovered only by operation in 1956. The statements of the plaintiff and his private physicians indicated that the disability was rather severe, and that, while plaintiff was able to pursue a limited dental practice for a period of years by constant medication, therapy, and accessories, he eventually had to give up his practice. The facts, as reflected by the evidence at the time, were adequate for at least granting a hearing with an opportunity to present a complete record to the Board. Those facts also required the granting of relief to the plaintiff, if a hearing was not to be ordered.
The Board reached its decision, based at least in part on the opinion of the Surgeon General. The Surgeon General’s factual statement was to some extent incomplete and contrary to the evidence and the regulations and standards adopted by the Army for application in such cases.
*151 Plaintiff filed a petition herein and at the court trial presented testimony of himself, his wife, Dr. Meyer, Dr. La-Duca, and Helen L. Wasmimd. The following findings are based upon the testimony presented at the court trial.
19. When plaintiff arrived at the crashed plane at Pole-brook, England, August 1942, he found the bodies of two men confined to a very narrow space and tangled in the controls of the plane. In order to free those men, plaintiff had to untangle them by cutting away equipment and straps and hoisting them, from a cramped position, up over his head to an aide who pulled them out of the plane. It was urgent that such an undertaking be accomplished with maximum speed because of the danger from fire or explosion from gasoline which had escaped from the plane. When plaintiff attempted to climb out of the plane, he could not move his legs and his aide had to lift him out bodily and carry him to safety.
20. Suffering from severe pain in his back and legs, plaintiff was taken to a British dispensary, where he remained about a week, and was treated with physiotherapy, which consisted of heat, massage, and rubbing compounds. When he was discharged from the dispensary, he still was unable to put on his shoes and socks, and this had to be done for him each morning.
21. During the following year, August 1942 to August 1943, plaintiff experienced spells of pain in his back and legs, but, since he was the only medical officer in his Group, he gave himself medication. In August 1943, an exacerbation of symptoms occurred while bending over a foot locker. He could not straighten up without extreme pain. He was unable to completely unbend for about three weeks, when he was taken to the Tunis Hospital. He was given therapy and rest for a week or 10 days.
22. Beginning the latter part of 1942, plaintiff suffered gastronomical upsets and bowel difficulties for which he was admitted to the 35th Station Hospital in October 1943. When amoebic dysentery was not found, through smears and laboratory tests, it was suspected that there might be a nerve impingement causing an involvement in the lower *152 bowel due to the same condition which caused plaintiff’s back symptoms.
23. When plaintiff returned from overseas in June 1944 under the rotation program for reassignment, he was given three weeks’ leave, and when he returned to duty he was in such poor condition it was decided to send him to Mitchel Field Hospital. He was given physiotherapy consisting of heat, massage, muscular manipulation. When he returned to the Redistribution Center, he was told he would be on limited duty if he remained in the service. Colonel Pallette, head of the Orthopedic Section, discussed with plaintiff the possibility of surgery to alleviate his condition but advised against it as long as he could tolerate the pain. At the time, surgery for a spinal condition was considered to be hazardous, with the results uncertain.
24. Plaintiff was released from active duty for dependency hardship reasons. At the Fort Dix Separation Center, he was told that he was eligible to appear before an Army Retiring Boai’d but that the proceedings would require 3 to 6 months in a general hospital. Pie was advised the most rapid method to get home was through the hardship route. He felt that the situation at home was too critical to justify his spending an indefinite period in retirement proceedings. He also felt that after a return to practice with full control of his activities, he could improve his condition, by proper rest and treatment, and “make my own way.”
Since plaintiff had been found by the medical examiners to be fit for limited duty only, he could have, as a matter of routine, been sent to an Army Retiring Board. TM 12-245, October 1,1945, paragraph 15 (c) provided:
c. When the officer is recommended [by a Disposition Board] for permanent limited service and
(1) He does not desire to remain on active duty in a permanent limited service status, or
(2) Has been certified as nonessential as provided in paragraph 16,
the commanding officer will order the officer before the appropriate Army retiring board without reconvening the disposition board. If the officer is recommended for permanent limited service and has been certified as essen *153 tial as provided in paragrapli 16, lie will order the officer to the station of assignment obtained at the time of certification as to essentiality.
25. At the time of his separation from service, plaintiff was having continuous discomfort and pain in his back and legs, lack of sensation and extra sensation, prickling and numbness, inability to move legs freely, difficulty in walking up and down stairs, stumbling with left leg, limitation of motion. From an energetic man, at the time of his entry into active service at the age of 33, plaintiff had become nervous, walked with a one-sided or stooping appearance, suffered considerable pain evidenced by a wincing facial expression, could not walk upstairs without pain and without pausing to adjust his movement. Prior to active duty, plaintiff participated in sports, particularly bowling, but could not indulge in this activity after his return from the service. When he attempted to bowl, he fell flat on his face on two occasions.
26. Plaintiff resumed his dental practice at Angola but found that he could not lean or bend over without experiencing great pain and that he fatigued very rapidly. He could not turn his body in a normal manner or reach for instruments without considerable difficulty. To assist himself in continuing the practice of dentistry plaintiff installed a chair which moved on a trolley around his dental chair and which made it unnecessary to bend forward from a standing position. His assistant, Mrs. Wasmund, and subsequently his second wife, whom he married in 1947, aided him by handing him instruments so that he would not have to turn and reach for them. Even with this type of assistance and continued use of diathermy and medication, he could not maintain full-time practice.
Prior to his entrance on active duty, plaintiff had practiced 5 full days each week, including some evenings, and one-half day on Saturday. He was soon forced to give up Wednesdays and Saturdays, but even with this reduced schedule he had to rest between appointments, cancel many appointments, and was unable to work 4 full days regularly.
*154 Plaintiff’s practice gradually degenerated because of uncertainty of appointments. Extractions caused him to become so fatigued that he would practically collapse unless he stopped to rest. He reduced chair work more and more and began performing surgery at the hospital where he had considerable help and more flexible conditions under which to work.
27. From the time of his return to Angola, plaintiff had continuous medical treatment, at the office of Dr. Diefendorf and by Dr. LaDuca when he returned from Army service in 1946. Dr. LaDuca treated plaintiff twice a week, which gave him temporary relief after spasms and enabled him to carry on to a limited degree. After Dr. LaDuca suffered a cardiac condition, Dr. Meyer took over plaintiff’s treatment in 1954.
When Dr. LaDuca first examined plaintiff in April 1946 he found marked rigidity of muscles, limited motion in all directions, tenderness between L4 and L5, and variable sensations of cold, heat, and numbness. Dr. LaDuca saw plaintiff many times. Plaintiff had to go to him for relief and he was given diathermy, infrared, and much medication. Dr. Meyer gave plaintiff massive doses of various medications “to keep him on the. job.” Plaintiff’s condition improved for a while, but such improvement was only temporary.
When plaintiff suffered the acute exacerbation of symptoms in 1956, prior to surgery, his bowel and bladder were paralyzed for approximately 3 days. He had continued to experience irregularity with his bowels, diarrhea or constipation, since 1944, which Dr. Meyer thought was neurogenic in nature. At Dr. Meyer’s recommendation, the operation at the Buffalo Veterans Administration Hospital took place. The operation cured the paralysis but relieved the back condition for only a short time. Plaintiff soon became almost totally disabled.
28. At the hospital in 1956 the actual cause of plaintiff’s condition, herniated disc, was first discovered. Both the Army medical officers and the Veterans Administration physicians had variously diagnosed his case as strain or sprain of lumbosacral muscles; a recurrent back strain; spondylo-listhesis and myositis; myalgia; low back strain. Although Dr. Meyer felt that he had something in his back, a “vague *155 thing”, he was unable to make an exact diagnosis. Dr. LaDuca diagnosed the severe lumbar condition as sprain, although he suspected a possible, disc involvement.
X-rays prior to 1955 were entirely negative, which is not unusual, because they frequently miss a ruptured disc. There are many occasions when a spinogram fails to show a ruptured disc which is subsequently found through surgery. A disc was considered a possibility by the Veterans Administration examiner in 1954, but, according to the records, not even suspected by the Army or Veterans Administration physicians prior to that time.
29. Dr. LaDucai, who was an officer of the Army Medical Corps from 1942 to 1946, expressed the opinion that plaintiff had a herniated disc at the time of his separation in 1944; that he was totally disabled for military service at that time; that he was unfit for full military service in the field in time of war; and that plaintiff was incapacitated to a large extent for his civilian practice.
Dr. Franklin Meyer, who was also with the Army Medical Corps from 1945 to 1947 and who had considerable experience with Army Retiring Boards, testified that plaintiff’s symptoms from 1944 were consistent with the symptoms of a herniated nucleus pulposus; that, on the basis of plaintiff’s history, the medical findings, the myelogram, and the operation in 1956, there was no doubt that plaintiff suffered a herniated disc at the time of his accident in 1942. Dr. Meyer testified that an officer with a herniated disc would have been retired and that in 1944 plaintiff was not capable of performing full military duty. Defendant’s witness, Colonel Opsahl, testified that many officers were retired for herniated nucleus pulposus.
summary AND CONCLUSIONS
30. On the basis of the complete record as well as on the basis of the record before the Correction Board, it is found that the Board and the Secretary of the Army were arbitrary in denying plaintiff a hearing and in denying his claim for relief.
Although plaintiff had a herniated nucleus pulposus at the time of his release, the War Department was ignorant of his *156 true condition and bad diagnosed it merely as strain or sprain. Diagnosis of such a condition is difficult as an X-ray frequently fails to disclose it. At the time of plaintiff’s separation, myelograms were considered dangerous and were seldom used.
At the time of his separation, plaintiff was ignorant of his true condition. He felt that with control of his activities and proper rest, treatment and medication, he could cure himself, or at least maintain a reasonable practice of dentistry. While he could have appeared before an Army [Retiring Board, this would have involved considerable delay, whereas he felt that extreme hardship conditions at home necessitated his immediate return. The War Department granted plaintiff’s request for release on a hardship basis. Thus, he was released without the customary processing before a Disposition Board and Retiring Board, but with medical findings that he was fit only for limited duty.
Plaintiff was able to resume his dental practice only with constant and continuous physical therapy, massive medication of various kinds, mechanical aids to conserve his strength or eliminate motion and bending, and human assistance. Even with all these aids, his practice was substantially curtailed.
Plaintiff did not resort to surgery because of advice of both military and private physicians that this was hazardous, the outcome uncertain, and that it should not be undertaken so long as he could tolerate the pain. For a period of many years he managed to keep going in a restricted manner until 1956, when an acute condition paralyzed his bladder and bowels and he was compelled to accept surgery. His condition was found to be caused by a large herniated disc, which the surgeon attempted to remove. The operation was not successful and provided only temporary relief. Plaintiff suffered a recurrence of the condition. With no hope of eliminating his condition, and his practice seriously degenerating, he gave it up entirely.
31. Plaintiff was permanently incapacitated for active service at the time of his release to inactive duty in 1944 and the ultimate administrative findings, made after it was *157 clearly demonstrated by surgery that he had and had had a herniated nucleus pulposus, were arbitrary and not supported by substantial evidence.
CONCLUSION OP law
Upon the foregoing findings of fact which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment will be entered to that effect.
The amount of recovery will be determined pursuant to Eule 38 (c) of the Eules of this court.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on May 3,1963, that judgment for the plaintiff be entered for $36,180.03.
On defendant’s motion for a rehearing and to amend the decision of the court of November 7, 1962, ante, p. 135, the following per curiam opinion was rendered January 11,1963:
This case comes before the court on defendant’s motion filed December 6,1962, under Eule 53 for a rehearing and to amend the decision of the court of November 7,1962. Upon consideration thereof, together with the plaintiff’s response thereto, the defendant’s motion is denied.
It is so ordered.

 Plaintiff was greatly concerned over tie immediate needs of Ms family — Ms wife was in a hospital on acconnt of a mental illness ; Ms children were living with relatives; and his father needed an operation for cancer — and he therefore desired to effect a quick separation. He was told that Retiring Board proceedings might require additional lengthy hospitalization and that a hardship release would be much speedier. In addition, he thought that he could “get along” or “make [his] own way” in civilian life. See findings 8-9, and 24. At that time neither he nor the Army was aware of the true nature of his injury as it was later disclosed to be. See findings 7, 18, 28, and SO.

 We do not believe that the rule that the serviceman's refusal of an offer of a Retiring Board (at the time of separation) is insufficient to accrue the judicial cause of action allows him improperly to extend the limitations period for self-serving reasons. The service has it within its power to order him before a Retiring Board, whether he wants one or not, and thus to accrue his judicial claim.

 The x-rays taken prior to 1955 were negative, but this was not unusual; such x-rays often miss a ruptured disc and diagnosis of that condition is frequently difficult. Also, at the time of Harper’s separation in 1914, myelo-grams were considered dangerous and seldom used.

 The American. Illustrated Medical Dictionary, Dorland, 22nd Edition, defines spinogram and myelogram as the same : “A roentgenogram of the spinal cord.”