Martin MERSON

v.

The UNITED STATES.

No. 5–60.

United States Court of Claims.

July 17, 1968.

As Amended Oct. 4, 1968.

Paul R. Harmel, Washington, D. C., attorney of record, for plaintiff. Thomas H. King, Washington, D. C., of counsel.

Arthur E. Fay, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

DURFEE, Judge.*

This action to recover disability retirement pay was brought by a Navy Commander on the ground that when he was released to inactive duty as physically fit on March 29, 1946, he was physically unfit for service, and should have been retired for service-connected disability.

On October 15, 1965, the court rendered its first decision dismissing plaintiff's petition. Merson v. United States, 173 Ct.Cl. 92 (1965). Upon the filing of plaintiff's motion for rehearing, a new trial and suspension of proceedings, the court on April 15, 1966, entered its order remanding the case "to the trial commissioner with directions to take further and additional evidence on the basis of the materials submitted by plaintiff in the appendix to his * * * motion". The commissioner was therein directed "to make new findings based on all the evidence bearing upon plaintiff's condition at the time of his release to inactive duty as physically fit on March 29, 1946, and *not limited to evidence relating directly to plaintiff's physical condition prior to or at the time of said release*". [Emphasis supplied.] The testimony of additional witnesses was presented by both parties.

After a new trial, the trial commissioner has submitted his new findings and report in accordance with the court's order. Exceptions have been taken, and the case has again been argued on briefs before the court. We now decide that plaintiff is entitled to recover, contrary to our previous decision.

One of our principal conclusions in the prior *Merson* decision was that plaintiff had "a ten-year period of continuous active and successful employment with no record of any recurrence of malarial or disease symptoms", after his release in 1946. We shall now reconsider this conclusion in the light of the new evidence presented at the second trial, together with the entire record.

Prior to his naval service, plaintiff had graduated from Harvard Law School in 1933, was associated in practice with two preeminent law firms in New York City and was a highly successful corporation lawyer in excellent physical, mental and emotional condition. His naval career was marked by outstanding ability and success until violent malarial attacks during 1943 at Guadalcanal in the South Pacific brought about his subsequent disability. Following his release from service in 1946, he resigned from his pre-war position as a sales representative for United States Steel Export Company on advice from navy doctors not to return to a tropical climate. For six months thereafter, he was employed by the Electric Boat Company in Groton, Connecticut, at a salary of $700.00 a month until his employment was terminated by his employer for health reasons in October 1946. Upon application to the Veterans Administration on June 10, 1947, he was awarded ten percent disability compensation, effective March 30, 1946, for "nervous condition following recurrent malaria", with tremors of the head noted. This diagnosis and rating was substantially reiterated by the Veterans Administration in 1948.

From 1947 to 1952, he was employed by the Dixie Cup Company. While so employed, he requested discontinuance of his monthly V.A. compensation payments because "so far as I am able to determine, my condition has not become aggravated, and I find that I am able to earn a livelihood. So long as this condition obtains, I shall make no further claim for compensation". Although his earnings at the Dixie Cup Company increased for this period of employment from $8,312.53 in 1947 to $20,000 a year in 1952, his employment was then terminated by his employer because of his increasing nervous and emotional affliction, and the tremors of his hands and head. In the words of his employer, "He was more of a liability than an asset".

---

* The court acknowledges the assistance it has received from the report of Trial Commissioner William E. Day, although we have reached a different conclusion.

After two short periods of temporary employment for the United States Government, October 1952 to July 1953, plaintiff was employed as vice president of Temple University at $12,000 per annum. After seven months, he was asked to resign because he was not well enough to continue, again because of his service disability.

From 1955 until 1957, he attempted to practice law in Philadelphia without success, despite his outstanding prewar legal career. His brother furnished the office, paid the rent and supported plaintiff and his family.

In 1958, unable to find other work, he taught in a North Carolina High School for a school year, at a salary of $3,000. Thereafter, he taught part-time for a short time in a college, but left when told that his work was unsatisfactory because of his physical and mental condition. As far as the record shows, he has had no employment thereafter.

It is clearly evident that, contrary to our former conclusion that plaintiff had "a ten-year period of continuous active and successful employment with no record of any recurrence of malarial or disease symptoms", the record of post-war employment of this formerly highly successful corporation lawyer is one of continuing and disastrous decline. In 1957, he was rated by the Veterans' Administration as 50 percent disabled from "Parkinsonism" originating in service. Thereafter, he apparently has had no gainful civilian employment.

Plaintiff served on active duty for reserve training as a Navy officer for six two-week periods from 1949 to 1956, and was found physically fit by the Navy for active duty for each of these short periods. No defects were noted that would affect performance of his duties. However, these fitness reports were apparently perfunctory lay reports of non-medical officers based upon plaintiff's clearly apparent willingness and desire to remain in the reserve and to earn a livelihood, as well as the desire of the Navy at the time to retain officers in the reserve if possible. Despite these fitness reports, and recommendations for promotion, plaintiff received no promotion after his release from the Navy.

In Powers v. United States, 176 Ct.Cl. 388, at p. 401 (1966), this court observed, under similar circumstances:

* * * Nor can much weight be placed upon plaintiff's certificate of physical capacity, since he was afflicted with a psychiatric ailment (see Ludzinski v. United States, 154 Ct.Cl. 215, 232 (1961) and "neither * * * [he] nor [the] doctors fully knew the nature and extent of his disability at the time of his discharge". Grubin v. United States, 166 Ct.Cl. 272, 277, 333 F.2d 861, 863 (1964). And "[l]ike lawyers, medical men are often poor judges of their own cases * * * ". The events here show that plaintiff was as far wrong as the Army * * * [doctors in knowing] * * * the true course of his disability. * * *

We noted in Cooper v. United States, 178 Ct.Cl. 277, 305 (1967) evidence that: "Patients may minimize or deny the existence of symptoms to serve particular psychic needs". There is nothing in the record to indicate that plaintiff was given a psychiatric or neurological examination by the Navy during these short periods of training. Any probative weight that could be attached to these reports is overcome when we consider that during this same ten-year period, the only medical examinations of plaintiff were by the Veterans Administration, whose neurologists found a ten percent service-connected disability in 1947, which was advanced to 60 percent by 1958. During this same period (1949 to 1956) plaintiff's civilian work record was one of steadily recurrent failures because of his physical and mental condition, despite his constant efforts to continue work.

In Hoppock v. United States, 176 Ct.Cl. 1147 (1966), we noted, at pp. 1165–1166:

* * * Being gainfully employed for a period of years does not establish a normal adjustment if underlying the

gainful employment there is a history of seven job changes, inability to meet the responsibilities which the employment involved, and failure to retain any of the seven positions for a considerable length of time. The employment record revealing a "socio-economic impairment, moderate to severe" (V.A. psychiatric examination of 10–16–63) tends to confirm rather than discount the other evidence of a neurosis or psychiatric condition contracted during plaintiff's active service in combat, and medically confirmed as a "true combat fatigue".

■ These same observations are applicable to Merson's employment record, except that plaintiff's service-connected mental and physical condition has been rated by the Veterans Administration at 60 percent in 1958 as "Parkinsonism". Certainly there is no substantial evidence in the entire record now before us that plaintiff had "a ten-year period of continuous active and successful employment, with no record of any recurrence of malarial or disease symptoms" from 1946 to 1957. On the contrary, the record is now clear and substantial that during this ten-year period he could not hold a job, despite his constant efforts because of his service-connected disability. Since 1958, he has had no gainful employment as far as the record shows.

In our previous *Merson* opinion, we commented upon the very close factual question as to plaintiff's claim that he was unfit for active duty when released from service, citing Boland v. United States, 169 Ct.Cl. 145 (1965) at p. 150:

Treating the evidence as a whole, we cannot say who was right or wrong. * * *

Accordingly, we found that plaintiff Merson had not met his burden of proving that the refusal of the Correction Board to act upon plaintiff's application was not based upon substantial evidence, or was not arbitrary or capricious. This conclusion was partly upon the basis that plaintiff's medical evidence was based "largely on diagnostic observations and medical examinations made eleven years after plaintiff's release, and conceded to be of 'somewhat limited value in establishing an exact etiology' ".

We have now reached an opposite conclusion from the medical evidence, based upon the entire record before us, including the lay and expert medical evidence introduced at the new trial as to plaintiff's physical condition during and after his naval service.

Essentially, plaintiff had established in the prior case that following active combat duty in the Pacific Theater in 1942, he suffered long, severe and virulent attacks of malaria at Guadalcanal in February 1943, following which he was hospitalized most of the time in ten different naval hospitals for over two years with a continuing diagnosis of "Malaria Malignant Tertian, #1004". On January 19, 1944, following discharge from a naval hospital, a board of three navy doctors found that he was "physically qualified for *limited shore duty only*". [Emphasis supplied.] In April 1944, he was promoted to Lieutenant Commander (temporary) and was found fit for active duty at sea or on foreign service.

In March 1945, following a physical examination, plaintiff was issued a $5,000.00 life insurance policy, with a history of hospitalization for malaria in 1943 at Guadalcanal. However, this examination did not include neurological or psychiatric examinations, probably because plaintiff stated he had had no malarial attacks since 1943.

In April 1945, plaintiff was operated on for hernia. He was given unusual care because of his history of "latent malaria" and "8 malarial lapses", but received no neurological or psychiatric examinations, and was discharged to duty as fit. On June 16, 1945, the Neurology Department of the Bethesda Naval Hospital noted "Facial tremors * * * Generalized abnormal EEG". An "EEG", or electroencephalogram, had been previously requested by a navy doctor, following an eye examination of plaintiff. An electroencephalogram is made with

an "electroencephalograph" which detects and observes abnormal brain waves by recording electrical impulses between electrodes placed over designated areas of the brain. There was a later report on July 3rd of a second encephalogram with the same observation, "Generalized abnormal EEG". These and further observations led to the conclusion at the hospital on July 3, 1945, that *"Regardless of any organic cranial lesion that he may have* (sic) He manifests a definitely neurotic reaction and attitude, *both of which merit tense psychiatric attention"*.

[Emphasis supplied.] Ten days later, on July 13th, plaintiff's original diagnosis of "No disease, headache" was changed to "Asthenia, Post-infective". We find this last general conclusion that plaintiff's condition was merely one of debility or loss of vitality completely at odds with the specific findings previously noted, and even more so, when four days after this general diagnosis of asthenia, the neurologist at the Bethesda Naval Hospital noted that, although a good part of plaintiff's disability was psychogenic, "the fact that he had cerebral malaria and changes on his electro-encephalogram cannot be ignored", and again noted that his definite neurotic reaction and attitude merited "tense psychiatric attention." Obviously, his condition was one of close concern for the specialists who examined him.

For the ensuing five months, until January 1, 1946, plaintiff was a patient in a convalescent hospital at Asheville, North Carolina, described by one of the navy doctors then on duty there as "largely a place where you could come and sleep and eat, look after yourself as you pleased". He received no specific treatment for his condition other than rest.

During this five months' hospital convalescence, on October 15, 1945, plaintiff appeared before a Board of Medical Survey, which found plaintiff "unfit for duty" in its report of medical survey, and recommended further treatment. Only a month later, on November 16th, a Board of Medical Survey found that plaintiff was "physically able of assuming full duty". This conclusion was again reached on January 1, 1946, in reporting plaintiff physically qualified for temporary promotion to Commander, and the next day a Board of Medical Examiners found plaintiff physically qualified for release from active duty, and he was released, following terminal leave, on March 29, 1946, "incident to demobilization". We note these words because of their significance in this case.

This court has repeatedly had occasion to observe that during the vast process of suddenly demobilizing hundreds of thousands of World War II veterans during 1945 and 1946, the exigent circumstances in the Medical Services did not permit, as a practical matter, thorough physical examinations prior to release from military service, even when warranted by the medical history. This has been particularly evidenced when veterans like this plaintiff have insisted that they were physically fit in order to be released from military service to resume their normal civilian careers. In *Hoppock*, supra, we note at p. 1166 of 176 Ct.Cl.:

> The terminal physical examination given plaintiff on September 25, 1945, and the promotional physical examination of October 19, 1945, deserve comment because of the Board's apparent reliance on the findings made therein with regard to plaintiff's physical qualifications. *It would seem sufficient to state that no psychiatric or neurological examinations were made when those examinations were accomplished,* although plaintiff's history of combat neurosis is noted in each examination report. Suffice it to say that during the mass demobilization of 600,000 officers and nearly 8,000,000 enlisted men from 1944 to 1946, "terminal physical examinations were not as thorough as they might have been in many cases and that a more intensive investigation * * * might have developed hidden clues of things to come". *Smith* [Smith v. United States], supra, [168 Ct.Cl. 545] at 549. See also Woodard v. United States, 167 Ct.Cl.

306, 310–11 (1964). [Emphasis supplied]

In the present case, Dr. Shumway was a member of the Board of Medical Survey that (on October 15, 1945) found plaintiff "unfit for duty" and requiring further treatment. He was also a member of the Board that one month later found plaintiff "fit for duty". At the new trial, he stated that this "fit for duty" finding was made even though there was no substantial change from plaintiff's condition at the time of the first Board's "unfit for duty" finding. Dr. Shumway also stated that there was a tendency of doctors to overlook symptoms because of the pressures of the ending of the war, and everyone wanting to go home. In addition, the hospital was scheduled to be closed in February or March 1946.

Readily apparent is the fact that despite repeated warnings of "facial tremors", "Generalized abnormal EEG", the need for "tense psychiatric attention of his neurotic reaction and attitude * * regardless of any cranial lesion he may have", regardless of "the fact that he had cerebral malaria and changes in his electro-encephalogram (which) cannot be ignored", this alarming prognosis was ignored by the Medical Board which found Merson fit for duty at the time of his release. None of the members of this Board was a neurologist or psychiatrist. Other than noting a history of "malaria—1943 UCD" * * * "May 1945 last recurrent attack", there is nothing in the record of the report of January 2, 1946 by a Navy Board to the U. S. Naval Personnel Separation Center to indicate that the prior prognosis and specific warnings from the specialists were given the serious and careful consideration that they required. From the expert medical testimony by three distinguished specialists in neurology and psychiatry at the new trial, as to plaintiff's brain condition, it is obvious that this condition could not have been

properly evaluated at the time of his release without further psychiatric and neurological examinations. Equally obvious is the fact that whenever plaintiff was examined by neurologists or psychiatrists before release, his disabling psychiatric and neurological symptoms were repeatedly observed and noted in his medical record. We conclude that plaintiff did not have a thorough or competent medical examination at the time of his release, because of mass demobilization, and because his condition was difficult to accurately diagnose at the time. Furthermore, because of complete rest, relaxation and rehabilitation for five months at the convalescent hospital in Asheville, North Carolina, plaintiff's condition, although disabling, may well have been quiescent or in a state of temporary remission during his inadequate medical examination upon separation.

■■ Most recently, in the case of Brown v. United States, Ct.Cl., 396 F.2d 989, decided June 14, 1968, we held that in reviewing administrative service decisions, including those of Correction Boards as to "substantial evidence" on military disability retirement pay cases, this court is not limited to the administrative record, and may take account of *de novo* evidence as to claimants' physical condition at the time of release and thereafter.[1] The Government did not object to the introduction of *de novo* evidence in the present case, and accordingly, waived any possible objection. Cf. Russell v. United States, Ct.Cl. No. 30–65, decided April 19, 1968.

We must now re-determine whether the decision of the Correction Board is based upon substantial evidence.

In some cases, the court has found medical examinations and medical history subsequent to discharge highly probative as to physical condition at the time of separation because of an incomplete or inadequate examination at the time of

1. See also, Beckham v. United States, 375 F.2d 782, 179 Ct.Cl. 539, 543 (1967); Walters v. United States, 358 F.2d 957, 175 Ct.Cl. 215, 224 (1966); Grubin v. United States, 333 F.2d 861, 166 Ct.Cl. 272, 301 (1964); Harper v. United States, 310 F.2d 405, 159 Ct.Cl. 135, 140 (1962).

separation, such as we find in the present case. Most of these cases arise out of the exigencies of mass demobilization following World War II, and the Korean conflict, which we have already discussed. See, e. g., *Hoppock*, supra.

In the case of Walters v. United States, 358 F.2d 957, 175 Ct.Cl. 215, (1966), the court discussed the relevancy of post-discharge medical evidence and the burden of proof which rests upon plaintiff once he has been found fit for duty, 358 F.2d at p. 962, 175 Ct.Cl. at p. 225:

> The test for recovery, however, does not rest solely on the reasonableness of the action of the examining physicians at the time of release from active duty. The petitioner may prevail if he can show that if the complete facts concerning his condition had been known at the time he would have been entitled to retirement by reason of physical disqualification under the pertinent laws and regulations. (citations) To this end, *reference must of necessity be made to his subsequent medical history* insofar as it sheds light on the nature of his physical condition while in service. Evidence of progressive deterioration and later discovered symptoms and disabilities may be decisive if it can establish that plaintiff's incapacity while in service was substantially more serious than suspected and that previous diagnoses were inadequate or incorrect. * * * [Emphasis supplied]

■ The necessity of considering *subsequent* medical history in this light has been repeatedly emphasized by this court in *Hoppock*, supra; Farrar v. United States, 358 F.2d 965, 173 Ct.Cl. 1008 (1965); Harper v. United States, 310 F.2d 405, 159 Ct.Cl. 135, 140 (1962); Grubin v. United States, 333 F.2d 861, 166 Ct.Cl. 272, 301 (1964), and other cases. The need for consideration of subsequent medical history was a basis for the order for new trial in the present case.

Nevertheless, the opinions of the medical witnesses for defendant have been limited almost completely to the naval medical records in existence *at the time of plaintiff's release*. Dr. Diamond, defendant's medical witness at the new trial, in summary testified that in his opinion that plaintiff was fit when released, was based solely on the evidence which existed *prior to the time of plaintiff's release*, although he had read some of the post-release reports. His conclusions were based upon an erroneous premise that because the consideration of post-release evidence involved "retrospect", it was not material. In *Walters*, supra, 358 F.2d p. 963, 175 Ct.Cl. p. 226, the court stated that new evidence presented to a Correction Board nine years after release "establishes *in retrospect* quite clearly that plaintiff's condition was incapacitating and permanent".

None of defendant's medical witnesses ever saw or examined plaintiff, except Dr. Shumway, who became a witness for plaintiff at the second trial after he had evaluated the new evidence.

He was one of the three Navy doctors on the Board which first found plaintiff unfit for duty on October 15, 1945. One month later, he was on a different Navy Medical Board which found plaintiff fit for duty shortly before his release. None of the other four Board doctors testified. Dr. Shumway testified at the new trial that he again saw plaintiff in 1947, about a year after his release, that he displayed marked tremors of the head and hands, and was mentally disturbed; that plaintiff had the Parkinsonism syndrome, and in the light of all the evidence, plaintiff had a psychiatric condition, and an organic injury to his brain incurred in service, which caused his disability, which existed at the time of release and rendered him unfit for active duty.

Certainly no other medical witness in this case had the great advantage of Dr. Shumway's actual observation and knowledge of plaintiff's condition at the time of release, and thereafter. His change of opinion in favor of plaintiff on the basis of the new evidence and re-evaluation of the old evidence is completely supported by the expert testimony of three distinguished specialists in neurology and psy-

chiatry, all of whom observed and examined plaintiff, and carefully evaluated all the medical evidence, old and new.

Dr. Harold Stevens, a distinguished specialist in neurology and electro-encephalography, examined Merson twice in 1963. On the basis of these examinations and a review of the Navy medical records, the post-release medical records of the Veterans Administration, and the entire record before him, he testified that in this frame of reference, plaintiff was "definitely incapacitated" and unfit for duty when released in 1946.

Dr. Hitzig, another distinguished specialist, after examining plaintiff in 1957, and on the basis of the medical records hereinabove referred to, testified that plaintiff was unfit at the time of release, with practically the same analysis of the record followed by Dr. Stevens.

Dr. Daniel S. Feldman testified extensively at both trials. He is a specialist in psychiatry and neurology, and also was a medical officer in the Navy (1954–1956), and is conversant with the Navy standards for fitness for service. Upon the basis of the new evidence at the second trial, together with the entire medical record, he concluded that plaintiff was at the time of his release, unfit for naval service.

Dr. I. Kotzin of the Veterans Administration, who had made earlier psychiatric examinations of plaintiff for the V. A., on December 17, 1959, reviewed the entire clerical record for the V. A. and concluded:

Now that years have gone by and symptoms have become progressively worse the symptoms and findings at the Navy take on more light. One may conclude that the facial tremors were the incipient manifestations of Parkinsonism Disease. It is well known that this disease starts very slowly and it may take some time until the diagnosis is made.

Considering the picture, as a whole it is my certified opinion that Parkinsonism may have well began [sic] while he was in service.

*Diagnosis:* (1) Anxiety Reaction, moderate to moderately severe with depressive features. (2) Parkinsonism Disease.

On February 1, 1960, the V. A. thereupon concluded that plaintiff's disability was "Parkinsonism", service-connected and rated at 60 percent.

The governing standard of disability to which we adhere is well summarized in the Synopsis of Opinions of the Naval Judge Advocate General (1958), referred to in our previous findings and prior decisions:

The general standard of fitness must be applied, in the case of an officer of the line, to all of the duties or billets in which such officer must normally, in the course of assignment over a period of time, find himself serving.

With respect to disability proceedings, the standard long applied in the naval service is whether the individual is or is not physically capable of performing all the duties of his rank, grade or rating to a degree that would reasonably fulfill the purposes of his employment.

In our prior opinion, we pointed out that, although the Correction Board in denying plaintiff's application, was not required to hold a hearing:

* * * The Board might have been well advised under the particular facts in this case to grant a hearing as twice requested by plaintiff. Whether he was fit for service when released would appear to be a complicated and difficult question of medical evidence and opinion that should have been gone into thoroughly by the Correction Board and a hearing for plaintiff would have been helpful. Plaintiff has never had any hearing of any kind before any Retiring Board, any Correction Board, or any other kind of a board. *Merson,* supra, 173 Ct.Cl. at pp. 99–100.

█ Upon reconsideration of the entire record now before us, we conclude that plaintiff was unfit for active duty by reason of psychiatric ailments and organic brain damage incurred in service,

and existing at the time of his release from the Navy on March 29, 1946, and that the decision of the Correction Board and the Secretary of the Navy was arbitrary, not supported by substantial evidence and contrary to the evidence and naval regulations.

Dr. Shumway, one of the Navy doctors who found plaintiff fit for duty (1946) and then changed his opinion at the second trial upon a review of the entire medical history and his own observations of plaintiff after his release, concluded in a statement in the record:

> I have found this review a most interesting experience and I am grateful that you called upon me to review one of my own actions taken 20 years ago. Having worked in the Veterans Administration, Department of Medicine and Surgery for this same period of time, I could wish that many other physicians might have a similar experience, since it teaches one again that in Medicine *humility is the handmaiden of time*. [Emphasis supplied.]

We may well paraphrase Dr. Shumway's conclusion, to observe that this review of our own 1965 *Merson* decision teaches us that in Law, as well as in Medicine, "humility is the handmaiden of time".

■ Plaintiff is entitled to recover disability retirement pay from the day following the date of release from active duty, less amounts received as disability compensation from the Veterans Administration and pay for Reserve Officer training, since his release from active military service. See, Motto v. United States, 360 F.2d 643, 175 Ct.Cl. 862, 869, (1966). Judgment is entered for plaintiff in accordance herewith with the amount of recovery to be determined pursuant to Rule 47(c).