Jones, Chief Judge,
delivered the opinion of the court:
This is a congressional reference case. The evidence was taken by a trial commissioner, Mastín G. White.[1] The facts are set out clearly and in detail in the trial commissioner’s report. We have adopted his findings, with some slight modification, and they are made a part of this report.
Briefly the facts are as follows: The plaintiff, an enlisted man in the National Guard, was called to active duty with the Army of the United States in November 1940. Later he attended an Officers Candidate School, was commissioned a second lieutenant in mid-1942, and assigned to service in the Field Artillery. In December 1942, he was transferred to the Army Air Corps and, after training, was given aeronautical rating as a bombardier in September 1943. He served as a bombardier until mid-November 1944.
At that time, while flying as a bombardier of a B-24 aircraft engaged in a bombing mission over enemy-occupied: territory, the plaintiff bailed out after the aircraft had sustained a disabling loss of two engines. The parachute’s *130 harness caught on a door latch or rivet in the escape hatch and plaintiff was left dangling in the violent slipstream of the aircraft. Another member of thé crew succeeded in disengaging the harness and the plaintiff fell clear of the aircraft. During the fall or upon striking the ground his head was snapped back and he sustained a violent flexion injury to his neck. He was stunned upon contact with the ground and when he recovered full consciousness he found his left arm was not functioning and he had severe pains in his neck and shoulder. He was captured by soldiers of the Hungarian Army and the German Luftwaffe and remained imprisoned until the spring of 1945. The plaintiff was not given any medical attention while he was a prisoner of war. Pie did not complain. However, he continued to experience periodic pains in the neck and shoulder.
While waiting for separation from the service in October 1945, he went on sick call and sought medical attention. He was interviewed by a physician, and he advised the physician about the lack of medical attention while he was a prisoner of war. As the result of the complaint, pictures were taken of the shoulder areas but no X-rays were made of the neck area. The shoulder X-ray did not reveal any injury. The physician suggested to the plaintiff that the pain was perhaps due to a pulled ligament. But neither the plaintiff nor the examining physician knew the full nature of his injury. Pie was separated from active service, not by reason of physical disability. During the next few years he suffered periodic pains in the neck and shoulder.
The plaintiff applied for a commission in the Regular Army on December 5,1946. He was notified to appear for examination but he did not report and his application was never processed. He participated in the Reserve programs of the Army Air Corps from 1946 to 1954, and in 1951, at the time of the Korean conflict, he was found physically qualified for extended active duty. However, because of the expected birth of a third child he requested and was given temporary deferment. He served on a short tour of active duty of a little more than 2 weeks in May and June 1952.
Through all these years the plaintiff suffered renewed attacks of periodic pains in the neck and shoulder. Some *131 times these would" be as widely separated as 6 months or more, but at other .times he would have two or three attacks the same month. He did not seek medical attention until July 1952. In 1952, he .was examined by an experienced orthopedic surgeon, Dr. Hush, of Meridian, Mississippi. X-ray pictures were taken of his neck and these revealed the injured vertebra.
He applied on April 13, 1953, to the Air Force Board for the Correction of Military Eecords and sought retirement as a reservist. He was given a physical examination at the Keesler Air Force Base on July 1, 1953, and was found by the examining physician to be physically disqualified for active military service. The application was referred to the Surgeon General who reported on August 20,1953, that the plaintiff was not permanently disabled at the time of his discharge in 1945. The Air Force Board for the Correction of Military Eecords found that no corrective action was indicated in the case. Plaintiff was, on August 16, 1954, transferred to the Air Force Eetired Eeserve effective August 31, 1954 “by reason of medical disqualification for active duty, as result of service connected disability.”
In September 1952, plaintiff was awarded by the Veterans Administration a rating of 20 percent disability as of July IT, 1952, for a service-connected “herniated nucleus pulposus between C-4 & 5, left.” The rating was increased to 40 percent in December of the same year and was reduced to 20 percent March 20, 1956.
The plaintiff has no legal claim. His petition does not allege that the Board for the Correction of Military Eecords was either arbitrary or capricious in its finding that he was not disabled from military service at the time of his separation in 1946. In addition, the evidence is not sufficient to show that plaintiff .was incapacitated for military sendee at that time.
On the other hand, the record definitely indicates that he was disqualified for active duty as of August 31, 1954. In fact, as the result of a physical examination of August 16, 1954, he was transferred to the Air Force Eetired Eeserve and found disqualified for active duty.
*132 The question remains if anything is equitably due from the United States to the plaintiff.
We find in view of the record that there is not the slightest doubt that injury was service-connected and we find that plaintiff was disqualified from military service beginning August 31, 1954.
Under the law and regulations as they are now in effect a claimant is not entitled to recover unless he was disqualified at the time of his separation from active duty. Whether an exception should be made in plaintiff’s case as between him and the many others who might be similarly situated, or whether a general act should be passed giving retirement to all officers who were not disabled at the time of release from the service but later became disabled because of a service-connected disability, is a matter of policy that is wholly in the discretion of the Congress. If such general legislation were passed it would, of course, open up a wide new field since there are no doubt thousands of cases such as the one before us. Both the Department and the courts would be called upon to decide numerous cases where the disability is not as clearly service-connected as in the instant case. Heretofore such cases have been left for compensation by the Veterans Administration. If an exception were made here to that general rule, it would open the door to many other applicants for similar exceptions.
Whether the law should remain as it exists today giving retirement to those who were disabled at the time of retirement and permitting the Veterans Administration to take care of cases in which the claimant was not disabled at the time of his release from the service but who later became disabled, is in the field of policy which is wholly in the realm of the legislative branch of the Government.
In the circumstances and facts of this case, and in the present state of the law, we are of the opinion that the plaintiff is neither legally nor equitably entitled to compensable physical disability retirement.
This opinion and the findings of fact will be certified by the Clerk to the Congress pursuant to Senate Resolution 98, 86th Congress, 2d session.
Davis, Judge; Dtjreee, Judge; Laramore, Judge; and Whitaker, Judge, concur.
*133 FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Mastin Gr. White, and the briefs and argument of counsel, makes findings of fact as follows:

Introductory Statement

The plaintiff in this congressional reference case sustained a neck injury on November 17, 1944, in the course of parachuting from a disabled aircraft over enemy-occupied territory or when he struck the ground. At the time, the plaintiff was serving as a first lieutenant in the Army of the United States, assigned to the 15th Air Force in the Mediterranean Theater of Operations. Subsequently, after several months’ detention as a prisoner of war, he was liberated by the Allied Forces and was returned to the United States. The plaintiff was released from the active military service of the United States effective January 24,1946. The principal question involved in the case is whether the plaintiff, at the time of his release, was permanently incapacitated for active service as a military officer.
1. The plaintiff, William E. Stone, is an adult citizen of the United States and a resident of the State of Mississippi. His place of residence is Meridian, Mississippi.
2. On March 5, 1959, there was introduced in the Senate of the United States a bill (S. 1284, 86th Cong.) for the relief of William E. Stone. This bill provided as follows:
Be it enacted "by the Senate and House of Representatives of the United States of America in Congress assembled, That (a) the Secretary of the Air Force is authorized and directed to determine the amount and effective date of the retirement pay to which William E. Stone would have been entitled if (1) the Office of the Surgeon General of the Air Force in reviewing his case in 1953 had found that the said William E. Stone was, at the time he was relieved from active duty in 1946, permanently incapacitated for active service and that his incapacity for active service was the result of an incident of service as a commissioned officer in the United States Air Force incurred in line of duty not due to his own misconduct and such a finding had been approved by the President or his delegate, and (2) the *134 Department of the Air Force thereupon had certified William E. Stone in the grade of captain to the Veterans’ Administration for the receipt of retired pay under the Act of April 3, 1939 (53 Stat. 557; 10 U.S.C. 3687).
(b) Upon such determination, the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the said William E. Stone, after deducting any disability compensation he has received from the Veterans’ Administration, retired pay in such amount upon the conditions which would have been applicable if such certification had been made pursuant to the Act of April 3, 1939 (53 Stat. 557; 10 U.S.C. 3687).
(c) From the date of enactment of this Act it shall be held and considered that William E. Stone has been retired for physical disability and the Secretary of the Air Force is directed to pay him retired pay accordingly.
3. On June 2, 1960, the Senate of the United States adopted a resolution (S. Res. 98, 86th Cong.) declaring:
That the bill (S. 1284) entitled “A bill for the relief of William E. Stone”,, now pending in the Senate, together with all the accompanying papers, is hereby referred to the Court of Claims; and the court shall proceed with the same in accordance with the provisions of sections 1492 and 2509 of title 28 of the United States Code and report to the Senate, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand as a claim, legal or equitable, against the United States and the amount, if any, legally or equitably due from the United States to the claimant.
4. The plaintiff’s petition in the Court of Claims was filed on July 6, 1960. A formal pretrial conference was held on December 15, 1960; a trial session was held in Meridian, Mississippi, on January 9, 1961; and a further trial session was held in Washington, D.C., on February 24, 1961.
5. The plaintiff, then an enlisted man in the Mississippi National Guard, was called to active military duty with the Army of the United States in November of 1940. He later attended an Officer Candidate School and, upon completion of the course, was commissioned a second lieutenant in the Army of the United States on July 7, 1942. The plaintiff’s *135 initial service as a commissioned officer was in the Field Artillery. However, in December 1942 the plaintiff was transferred to the Army Air Forces. After a period of training, he was awarded a military aeronautical rating as a bombardier in September 1943.
6. The plaintiff went overseas in May 1944, and was assigned to the 15th Air Force in the Mediterranean Theater of Operations. Thereafter, he served regularly as a bombardier with the 451st Bomber Group in Italy until the event mentioned in finding 8.
7. The plaintiff was promoted to first lieutenant in the Army of the United States while serving with the Army Air Forces.
8. On November 17, 1944, while flying as the bombardier of a B-24 aircraft engaged in a bombing mission over enemy-occupied territory, the plaintiff bailed out after the aircraft had sustained a disabling loss of two engines. In the process of bailing out, the plaintiff’s parachute harness was caught on a door latch or rivet in the escape hatch and, as a result, the plaintiff was left dangling in the violent slipstream of the aircraft. The plaintiff was retrieved from this position by another member of the crew, and the plaintiff then succeeded in falling clear of the aircraft.
9. (a) Either during the course of parachuting from the aircraft, as related in finding 8, or upon striking the ground, the plaintiff sustained a violent flexion injury to his neck. He was momentarily stunned upon impact with the ground. When the plaintiff recovered his senses, he found that his left arm was not functioning, and he experienced severe pains in his neck and shoulder.
(b) Although the plaintiff, for approximately 8 years after the incident mentioned in paragraph (a) of this finding, was unaware of the exact nature of his injury, the fourth cervical vertebra had been partially dislocated and had been forced forward and downward a distance of about one-eighth of an inch toward the fifth cervical vertebra, and this movement had ruptured the disk of tissue separating the two vertebrae. In medical terminology, this was a subluxation of C-4 on C-5, resulting in a herniated nucleus pulposus. It was a pérmanent injury.
*136 10. After the events referred to in findings 8 and 9, the plaintiff was immediately captured by soldiers of the Hungarian Army and the German Luftwaffe. Thereafter, the plaintiff remained a prisoner of war in several German detention camps until his liberation in the spring of 1945.
11. The plaintiff was not given any medical attention during his detention as a prisoner of war. He did not request such attention, or make any complaint concerning his physical condition to the German authorities. However, the plaintiff continued to experience periodic pains in the neck and shoulder.
12. The plaintiff was liberated from a German prisoner-of-war camp on April 29, 1945. He was returned to the United States in June of 1945.
13. After a period of rest and recuperation, the plaintiff was ordered to Kelly Field, Texas, in October 1945 for separation from the active military service of the United States. The plaintiff was at Kelly Field for 2 or 3 weeks while he awaited his processing for separation. He had continued,, since the injury referred to in finding 9, to experience periodic pains in the neck and shoulder, and one of these periodic attacks was experienced during the waiting period at Kelly Field. On the occasion of that attack, the plaintiff went on sick call and sought medical attention for the pain. The plaintiff was interviewed by a physician, and the plaintiff told him about the incident and neck injury referred to in findings 8 and 9, and about the lack of medical attention for the injury while the plaintiff was a prisoner of war.. As a result of the plaintiff’s complaint, X-rays were taken of the plaintiff’s shoulder area, but no X-rays were taken of the neck area. The X-rays of the shoulder area did not reveal any evidence of injury, and the sick-call physician so informed the plaintiff. The physician suggested to the-plaintiff that his pain was perhaps due to a pulled ligament..
14. On October 5, 1945, the plaintiff underwent a terminal physical examination at Kelly Field incident to his separation from the active military service of the United States. The plaintiff indicated to the examining physicians that he had not sustained any injuries while in the active military service. This statement was made by the plaintiff in the: *137 light of the information which he had received from the sick-call physician mentioned in finding 13. The examining physicians found that the plaintiff was not “permanently incapacitated for general service,” and they recommended his appointment in the Officers Reserve Corps of the Army. The report of physical examination in connection with the plaintiff’s separation from the active military service gave the plaintiff’s medical history as follows: “Prisoner of War •6 months, Germany, weight lost regained. Denies all operations, illnesses or injuries while in military service.
15. The plaintiff was separated from the active military service of the United States, “not by reason of physical disability,” under orders dated October 4, 1945, with terminal-leave credit extending his effective date of separation to January 24, 1946. Concurrently with his separation from active military service, the plaintiff was offered and accepted a commission as a first lieutenant in the Army Air Corps Deserve.
16. The plaintiff applied for a commission in the Regular Army on December 5, 1946. He was notified to appear for a physical examination in connection with the application, but he did not do so, and his application was not processed further.
17. (a) The plaintiff participated in the Reserve program (first, of the Army Air Corps and, later, of the Air Force after its establishment) from 1946 until 1954.
(b) The plaintiff was on active duty as a reservist from October 22 to October 26,1951, in connection with a possible recall to extended active duty because of the Korean conflict. He was given a physical examination on October 23, 1951. The plaintiff informed the examining physician that his health at the time was “excellent.” The plaintiff was found to be physically qualified for extended active duty. However, the plaintiff requested a temporary deferment because of the expected birth of a third child to his wife, whom he had married in July 1946; and he was not called for an extended tour of active duty.
(c) The plaintiff was promoted to captain in the Air Force Reserve in 1952.
(d) The plaintiff served a short tour of active duty as a reservist from May 24 to June 9, 1952.
*138 18. The plaintiff continued, through the years, to experience periodic pains in the neck and shoulder. Sometimes, these attacks would be as widely spaced as 6 months or a year apart. At other times, he would have two or three attacks in a single month. During these periodic attacks, there was, in addition to the pain, a partial loss in the freedom of movement of the neck and head from side to side. The plaintiff did not seek medical attention for his condition until July 1952. At that time, due to the urging of his wife, the plaintiff consulted Dr. Leslie B. Bush, of Meridian, Mississippi. Dr. Bush was and is a general surgeon, with extensive experience in the field of orthopedic surgery. Dr. Bush had X-rays taken of the plaintiff’s neck, and these X-rays revealed the vertebra subluxation mentioned in finding 9(b). This information was disclosed to the plaintiff, and for the first time he was aware of the nature of his injury.
19. The plaintiff applied to the Veterans Administration for disability compensation, and he was hospitalized by that agency for examination from August 27 to September 9, 1952. He was awarded a rating of 20 percent disability as of July 17, 1952, for a service-connected “herniated nucleus pulposus between C-4 & 5, left.” The rating was increased to 40 percent as of December 23, 1952.
20. Under the date of April 13, 1953, the plaintiff filed with the Air Force Board for the Correction of Military Becords an application asking that the report of physical examination dated October 5, 1945 (see finding 14) be corrected so that the plaintiff’s medical history during his wartime service would read as follows: “Prisoner of war 6 months, Germany, weight lost regained. Fracture dislocation, cervical vertebra 4 on 5, disturbance of alignment.”
21. The plaintiff sought retirement as a reservist; and he was given a physical examination at the Keesler Air Force Base on July 1, 1953. He was found by the examining physician to be physically disqualified for active military service. The reason for his disqualification was said to be “a fractured dislocation of cervical 'vertebrae 4 & 5 with partial fusion and some disturbance of alignment.”
*139 • 22. The plaintiff’s application'for the correction of his military record (see finding 20) was referred to the Office of the Surgeon General of the Air Force for consideration and comment. That office under the date of August 20, 1953, submitted a report stating in part as follows:
3. It is the opinion of the Surgeon General that at the time of his separation Lt. Stone was not permanently unfit for military duty, and, therefore, that his separation by reason of demobilization was not in error. The Surgeon General recommends that no change be made in the military records for medical reasons.
23. The Air Force Board for the Correction of Military Becords determined on January 7, 1954, with respect to the plaintiff’s application that “No corrective action is indicated in this case.” No hearing was held by the board on the plaintiff’s application. A subsequent petition by the plaintiff for reconsideration was denied by the board.
24. As a result of the physical examination referred to in finding 21, the plaintiff on August 16, 1954, was transferred to the Air Force Betired Beserve effective August 31, 1954, “by reason of medical disqualification for active duty as. result of service connected disability.”
25. As of March 20, 1956, the plaintiff’s disability rating (see finding 19) was reduced by the Veterans Administration from 40 percent to 20 percent.- It has subsequently remained at 20 percent.
. ■ 26. The plaintiff has been steadily employed since his release from extended active military/service in 1946: His present employment is with the Banking Department of the State of Mississippi as an examiner. Loss of time from work due to the periodic neck and shoulder pains mentioned in finding 18 has not been a major factor in the plaintiff’s employment record, although such periodic pains have continued through the years and on one occasion he lost a week from work because of an attack.
27. War Department Technical Manual 12-245 (1 October 1945), dealing with the subject of “Physical Beclassification,. Betirement, and Betirement Benefits for' Officers,” provided in pertinent part as follows at the time of the plaintiff’s release from extended active military service in 1946:
*140 23. Nature of permanent incapacity for active service.
* * * ' * *
b. The word “disability”-as used in section 5 of the act of 3 April 1939, as amended, with respect to retirement pay benefits means such disability as would constitute a basis for the retirement of Regular Army officer personnel. Thus, what constitutes “incapacity for active service” for Regular Army officers likewise constitutes “disability” for officers who are not Regular Army officers.
c. The question whether an officer of the Regular Army is incapacitated for active service is one of fact. An officer is incapacitated for active service when he is permanently physically or mentally incapable of performing full military duty, field as well as garrison, in both peace and war. The fact that an officer may be capable of performing limited military service with the supply arms and services does not prevent his retirement under section 1251, Revised Statutes, * * * by reason of being permanently incapacitated for active service.
d. Incapacity for active service is a permanent condition, resulting from an incurable disease, injury or infirmity of such a character as to prevent the reasonable fulfillment of the officer’s employment. Such employment embraces the duties of his office in peace and war which are imposed by law, regulation orders, or custom of the service. The physical disability, on account of which the board is authorized to find an officer incapable of performing the duties of his office, must be permanent; that is, such that the removal of the disability within a reasonable time is highly improbable. If the disease, injury or infirmity is curable within even a considerable time, the disability is not permanent. However, if the disease, injury or infirmity is incurable within a reasonable time, the board should find the officer permanently incapacitated.
28. The evidence in the record warrants the inference that the plaintiff, as of the time of his release from active military service in 1946, was physically capable of performing the duties of a military officer, except during relatively short periods of temporary incapacity while suffering from periodic pains of the sort mentioned in findings 18 and 26. He was, physically incapable of performing the duties of a military officer from August 31, 1954.

 Since the evidence in this case was taken, and the findings of the trial commissioner reported prior to the opinion of the Supreme Court in Glidden Company v. Zdanok, 370 U.S. 530, we think it proper to file the report without reference to the Supreme Court’s opinion in that case.