Per Curiam ;
This is a military disability-retirement case in which Chief Commissioner Marion T. Bennett has concluded, after a trial, that (a) if the true facts of plaintiff’s service-incurred condition (a ruptured disc of the cervical spine) had been known at the time of his separation from the Army in 1945, he would have been entitled to disability retirement under the pertinent Army regulations, and (b) that the Board for the Correction of Military Records was arbitrary and unsupported by substantial evidence hi refusing to grant plaintiff such entitlement on the basis of the materials he presented to that board. We agree with these ultimate findings of the commissioner, as well as his other findings, and hold, on the basis of those determinations, that plaintiff is entitled to recover. This case is very close to Harper v. United States, 159 Ct. Cl. 135, 310 F. 2d 405 (1962), in which the claimant had also suffered, while in service, a disc injury which was not diagnosed until well after he was separated. In both'instances, the officer’s symptoms while in the Army (and for some time thereafter) were wrongly attributed to other causes believed to be temporary *1010 or not disabling; and in both, instances the officer was actually disabled, under the Army’s regulations, at the time of his release.[1] See, also, for comparable situations, Grubin v. United States, 166 Ct. Cl. 272, 333 F. 2d 861 (1964), and Woodard v. United States, 167 Ct. Cl. 306 (1964). Stone v. United States, 160 Ct. Cl. 128 (1963), prestented a different case; on that particular record, the finding' was that the officer was not incapacitated at the time of his release from military service but became incapable of performing his duties some eight years later (see 160 Ct. Cl. at 131, 140).
The plaintiff is entitled to recover and judgment is entered to that effect. The amount of recovery will be determined under Buie 47(c).
FINDINGS OF FACT
The court, having considered the evidence, the report of Chief Commissioner Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff was appointed and accepted a commission as a captain in the Medical Corps of the Army of the United States, Serial No. O 1 693 351, on July 3,1942, after requesting and receiving a waiver for overweight, being otherwise physically qualified for a commission. He was promoted to a major in the Army of the United States on May 16,1945, and ..to a major in the Medical Corps, Officer Beserve Corps, On September 20,1945.
He was honorably discharged from his commissions as a major in the Medical Corps of the Officer Beserve Corps and as a major in the Army of the United States on December 26, 1951. He was on active duty as a commissioned officer from August 1,1942, to December 29,1945, when he was relieved from active duty by reason of demobilization. He had been placed on terminal leave on September 20,1945, reverting to an inactive status on December 29, 1945. He was subsequently discharged from the Officer Beserve Corps on September 26,1951, because he was then considered permanently *1011 physically disqualified for general military service. Plaintiff’s records in the custody of the Adjutant General show that he received adjectival ratings of “excellent” as an officer.*
2. In this suit, plaintiff alleges that at the time of his separation from military service on December 29, 1945, he was permanently incapacitated for active service by reason of injuries sustained in the military service and entitled to disability retirement pay; that the decision of the Army Board for Correction of Military Records in 1960 and 1961, denying such retirement pay, was arbitrary, capricious, not supported by substantial evidence, contrary to the evidence and erroneous in law; and that he should be awarded a judgment for monthly disability retirement pay from December 29, 1945, less disability compensation received from the.Veterans Administration.
3. Plaintiff graduated from the Indiana University Medical School in 1934 and had a year of internship during 1934 and 1935. He specialized in surgery as an assistant resident in 1935 and 1936 and was chief resident in 1936 and 1937, He was in general practice from July 1937 through October 1941. He entered New York Medical College, on a 2-year surgical fellowship in residency and surgery, in October 1941. Completion of the latter was interrupted by the war and plaintiff’s enlistment for active duty in July 1942.
4. Plaintiff’s military occupational specialty (MOS) was general surgeon, No. 3150. He became an operating surgeon on the general surgical team of the Third Auxiliary Surgical Group, and served in the European Theatre of Operations from December 7,1942, to May 19,1945, when he returned to the United States. Because of the Army’s experience in World War I, in which many men wounded in combat had died during transportation to field hospitals, this kind of group was formed to perform emergency operations on non-transportable casualties within the combat zone immediately behind the line of battle. Plaintiff performed combat duty *1012 in the campaign battles of Tunisia, Sicily, Normandy, Northern France, Ardennes, Rhineland and Central Europe.
5. On D-Day, June 6, 1944, plaintiff, as a member of the Third Auxiliary Surgical Group, accompanied the Infantry in the Normandy invasion at Omaha Beach. Plaintiff arrived at said beach slightly after dawn, 27 minutes after the Infantry landed. He had crawled about 5 yards from the water’s edge when an 88 mm. artillery shell burst near him. He was struck by shrapnel. Plaintiff’s evidence is that simultaneously he threw himself or was in some manner thrown to the ground forcefully. Plaintiff remained on the beach until dusk. After plaintiff was injured, he and a captain, who had also been hit, crawled into a nearby shell hole, or bomb crater, along with three wounded infantrymen. He was given first aid on the beach and during the night was transported back to England aboard an lst. Plaintiff’s injuries as noted at that time consisted of the “shrapnel wound right leg, and right lumbar region.” More specifically, plaintiff sustained various shrapnel wounds, including a mild, lacerated wound in the right lumbar region, a penetrating wound in the right upper leg and a penetrating wound of the poplit-eal (the posterior surface) area of the right knee. X-rays demonstrated a small piece of shrapnel in the soft tissues of the upper right leg, posterially, and a small foreign body in the posterior of the soft tissues of the right knee.
6. From the time of his injuries to his hospitalization in England, plaintiff had temporary periods of amnesia. Because of symptoms of rigidity and stiffness of his neck, spasms of the neck muscles, headaches for 8 or 4 months thereafter and restricted range and motion of the neck, as well as temporary periods of amnesia, plaintiff believes he experienced a concussion. There is no contemporary documentation as to any concussion.
7. After treatment by mobile officers of the 28th General Hospital, plaintiff was admitted in ambulatory condition to the United States Army Hospital at Cirencester, England, where, according to the records, he was treated from June 10 to June 14, 1944. Upon physical examination no abnormalities were noted. An “abrasion of [the] right lumbar region” was found. The hospital record also noted a “pene *1013 trating wound of the right popliteal area of [the] leg.” An X-ray of the lumbar spine indicated no abnormality; however, a small piece of shrapnel was shown, by X-ray, in the soft tissues of plaintiff’s upper right leg, posteriorly. X-rays of his knee and leg were taken. On or about June 14 he was discharged to duty to his own unit. Plaintiff was then taken by ambulance to his headquarters where he convalesced until July 16,1944.
8. During plaintiff’s convalescence he began to feel numbness in his hands. After resuming duties on the continent after the Battle of St. Lo the numbness became more marked and was accompanied by intervals of pain. By September 1944 he had considerable pain in the back, neck and shoulder girdle. Upon reporting these conditions to his commanding officer it was suggested that he consult Colonel Feder, chief of medicine at the nearby 45th Evacuation Hospital. Plaintiff was admitted to this hospital on November 7, 1944. His wounds had healed well. No organic or other objective cause of plaintiff’s condition was found. Colonel Feder concluded that plaintiff’s difficulty was neurotic, psychosomatic, or so-called combat fatigue, and suggested a convalescent hospital. The neurotic implications were distasteful to plaintiff. The actual diagnosis at the 45th Evacuation Hospital was “No disease, ill defined condition of musculo skeletal system manifested by muscular pains.”
9. Plaintiff’s symptoms continued unabated, including cramping and numbness in his hands, but he remained oh active duty. On April 25, 1945, he was directed to report to the separation station at Camp Atterbury, Indiana, for 45 days of rest and recuperation. Plaintiff arrived in the United States on May 19, 1945. On July 2, 1945, he was given a special examination at the AG & SF Redistribution Station, Miami Beach, Florida. The medical history portion of that examination states that plaintiff had “trouble with hands, lack of circulation.” Under the heading "“Bones, Joints, Muscles,” it is recorded “Hist, of vascular disease, hands.” He was found fit for overseas duty.
10. Plaintiff was then assigned to Fletcher General Hospital, Cambridge, Ohio. There he performed no surgery, *1014 having been informally excused. He was then experiencing severe pain in his hands, shoulder and neck. The chief of surgery at Fletcher had called plaintiff into his office and suggested that, if plaintiff would not be displeased, he would prefer that plaintiff did not perform surgery since there were some junior officers who had not done much surgical work and were anxious to do so. Plaintiff agreed, explaining that he would be happy not to work because of the difficulty he was having with his hands and neck. He was assigned administrative duties.
11. On August 27, 1945, the Surgeon General reported plaintiff to the Adjutant General as surplus and nonessential to the requirements of the medical department. He further advised that plaintiff was then assigned to Fletcher General Hospital, Cambridge, Ohio, that plaintiff was entitled to separation under honorable conditions, and that no hospital disposition board or Army retiring board proceedings were pending or believed to be appropriate. Plaintiff was then 3G years of age.
12. Plaintiff was admitted to Fletcher General Hospital as a patient on September 4, 1945. He complained then of a sore throat, coughing, runny nose, headaches and “tightness in chest and muscle pains in arms, shoulders and legs.” Plaintiff’s condition was diagnosed as “Nasopharyngitis, acute, catarrhal, moderate.” He was treated for the flu and discharged to duty September 10,1945. Plaintiff was given a general physical examination at Fletcher. No neurological abnormalities were noted.
13. Plaintiff was given a terminal physical examination at the separation center, Camp Atterbury, Indiana, on September 19,1945. The medical history portion thereof makes no reference to any complaints as to the neck or hand regions. Bones, joints, and neurology and psychiatric conditions were all stated to be normal. The questions on the physical examination form where a person’s permanent incapacity for general or limited sendee is to be indicated either affirmatively or negatively are unanswered. However, there is a remark “General Service” appearing thereon, apparently indicating plaintiff was regarded as being fit for such service.
*1015 14. Plaintiff was asked on trial wby he had not mentioned his symptoms at the separation center in view of the fact that he had previously mentioned them at the July 2,1945, examination at Miami Beach. He testified:
Well, I guess I was as foolish as the rest of them. First of all, the demobilization program was so rapid and so busy and there was always the current feeling if you wanted to get home right away it was better if you didn’t say anything as to any difficulty you had. And I suppose I fell into the trap as everyone else. I was anxious to get home.
Plaintiff further testified that at that time he had felt his difficulties were not permanent and would disappear upon reentering civilian life where he could control his activities. Plaintiff was then more concerned about his hands because they were the implements he needed to make a living. He was aware that he was having difficulty operating but did not then consider himself incapacitated. He also asserted that he had been led to believe that his symptoms were subjective, without organic cause, and had neurotic implications. He indicated that a further reason for not mentioning the symptoms at separation was the risk of stigma, due to the neurotic implications on his record.
15. After the separation physical, plaintiff, on September 19,1945, was ordered to terminal leave, reverting to inactive status on December 29, 1945. At the time of his separation he held the rank of major, which he had achieved on September 20, 1945. Also, as previously noted, plaintiff was separated from the service in December 1945 by reason of demobilization and not by reason of physical disability.
16. Plaintiff returned home and resumed private practice in the fall of 1945. Plaintiff’s symptoms have persisted His difficulties have included pain, cramping, loss of temperature sensation and touch perception, numbness in finger tips, numbness and pain in his arms, particularly the left, limitation of motion and pain in his left wrist, weakness and gross impairment of his grip, especially in his left hand, pain and limitation of motion in his neck, and pain in his shoulder, particularly the left.
*1016 17. The pain, numbness and lack of sensation considerably-interfered with plaintiff’s performance with surgery. Plaintiff could not distinguish between tepid and cold wet temperatures. He had difficulty in handling instruments. He could not tell the position of a surgical instrument in his hand and which fingers held it. He used oversized rubber gloves because the regular-sized gloves restricted his fingers and hands and caused numbness. By reason of frequency of fatigue and clumsiness in the operating room in June or July 1951 plaintiff failed to complete several operative procedures and other surgeons had to be called in to assist him or to actually complete the operations that he had scheduled as a surgeon. Plaintiff gradually gave up operations such as rectals and hernias, tonsils, fractures and emergency room work because of lack of strength in his hands to perform them. He was unable to set bones. He also gave up line surgery because he could not hold an instrument in a restricted area for any length of time. Plaintiff even curtailed the time spent on light surgery, although he was helped by resident assistants at the hospital and had an office assistant. He also took periodic rest breaks of several days from his limited surgery in order to be able to continue it.
18. Plaintiff’s physical condition caused him to give up pre-service sports and hobbies requiring the use of his hands, neck and shoulders. Such hobbies had included golf, gardening and wood carving. Plaintiff has substituted research and writing for full-time surgery. In 1959 he completed the writing of a book which was published by Lippincott. He is also working on a Master’s degree in foreign languages with a view to teaching them. Pie also does medical administrative work.
19. Due to his symptoms and suffering, plaintiff, on February 25, 1947, consulted Dr. W. E. Brogden, a specialist in bone, joint and traumatic surgery. Dr. Brogden summarized plaintiff’s complaints as follows:
* * * Pain, disability and numbness of the hands which causes a sensation of numbness up the forearm, left side only. The subjective and objective dysfunction is becoming gradually more pronounced and is beginning to cause considerable impairment in required *1017 bimanual dexterity, in the use of surgical instruments, in the capacity of a qualified full time civilian surgeon.
Dr. Brogden further noted:
Claimant attributes disability to service * * * [in 1944]. At that time [plaintiff] reported to 45th Evacuation Hospital, and from that time forward no diagnosis has been made nor treatment instituted. There is a history of repeated, mild, frostbite both hands. No history of prolonged immersions. The complaints and disability are considerably accentuated by exposure to cold, and hot climatic conditions causes an improvement.
Dr. Brogden found no gross impairment of function or grip in the right forearm or hand, but did find a 50-percent limitation in dorsi and palmar flexion of the left wrist and a 35-percent rotation impairment in the left wrist, and, as a result of that limitation and associated discomfort, a gross impairment of the grip in the left hand.
An X-ray at that time failed to reveal any radiographic evidence of articular or structural changes in the bones of the left hand. Dr. Brogden did not have an X-ray taken of plaintiff’s cervical spine at the time of his examination in February 1947. Dr. Brogden further commented that an absolute diagnosis was practically impossible at that stage of development, though he did negate Berger’s syndrome. He indicated that plaintiff might have a low-grade neurocircula-tory asthesia or a very early atrophic type of arthritis, or both. Dr. Brogden recommended “Combination treatment, intensive course consisting of pavex, short-wave diathermy and antiarthritic routine.” There is no reference in Dr. Brogden’s report to rigidity and stiffness in plaintiff’s neck.
20. Two of plaintiff’s medical colleagues suggested, upon his consultation with them after he returned from the service, that since they were unable to ascertain the cause of his symptoms that he avail himself of the superior diagnostic facilities of the Veterans Administration in Cleveland, Ohio. Subsequently, on March 25, 1947, plaintiff filed an application with the Veterans Administration for compensation for disability resulting from active service in the military forces of the United States. In his application, plaintiff noted that he had been confined for shell fragment wounds in the *1018 general hospital at Cirencester, England, and that in 1944 he had reported to the 45th Evacuation Hospital complaining of numbness in both hands due to repeated frostbite. He also stated that this condition was still bothering him, causing numbness in his hands.
21. The Veterans Administration requested plaintiff’s clinical records and apparently received them. Plaintiff underwent a physical examination at the Veterans Administration hospital in Cleveland, Ohio, on October 16, 1947. At that time he complained of. possible arthritis due to exposure to weather. He also complained of numbness and pain in his left hand and forearm and beginning numbness in his right hand and inability to grasp firmly with his left hand. Of current significance, the Veterans Administration examiner noticed a 30-p'ercent reduction in grip strength in the left hand and a gross impairment for pinprick and for temperature perception, particularly over the volar aspect of the first and second fingers on the left hand. That examiner diagnosed plaintiff’s difficulty as: “Lesion of the lower cervical cord, incipient syringogliosis. Minimal.” He further noted that the subjective and objective neurological findings had progressed insidiously and were, in all probability, referable to a small lesion of the cervical cord near the central canal. He also noted that there was no history of frozen hands or trauma and that the hands, wrists, elbows and shoulders were negative for any arthritic changes. He noted that moderate hypothenar and palmar atrophy was present and that the left-hand grip was reduced to 25 percent of normal by pain and 75 percent of normal in the right hand. He noted also that flexion at the wrist was reduced 25 percent with constant numbness in the fingertips. The report of the special X-ray was:
Cervical spine — there are moderate hypertrophic changes on the adjacent surfaces of the bodies of the fifth and sixth cervical vertebrae.
The medical examiner, after the report had been typed for his signature, wrote in an additional diagnosis of “Arthritis, hypertrophic, chronic, cervical vertebrae (shown by X-ray).” The examiner found plaintiff was “professionally only minimally incapacitated” but made a guarded prognosis.
*1019 The Veterans Administration rating sheet, based npon the October 16 examination, rated plaintiff 30 percent disabled by reason of the incipient syringogliosis lesion of the lower cervical cord and 10 percent due to the retained shell fragment in the right leg. No disability rating was assigned to the hypertrophic arthritis. This 40-percent combined rating was assigned plaintiff on December 5,1947.
22. On April 29, 1949, apparently in answer to a letter from the Ohio Military District, plaintiff indicated his election to continue active participation in the Organized Reserve program in a status appropriate to his age, grade and branch of service. On the form provided, plaintiff struck out the language which would have indicated inability to participate in training due to physical disqualification and did not indicate any physical defect in the space so provided.
23. In another examination at the Veterans Administration hospital in Cleveland, Ohio, on September 30¿ 1949, plaintiff complained of pain in the lower cervical region, left shoulder, left forearm and hand, and his right hand. He indicated that the pain was an aching numbness, worse on the left, and that he had no symptoms referable to the right lumbar region. The neurologic examination noted plaintiff’s last examination and the prior diagnosis of “Lesion of the lower cervical cord, incipient syringogliosis. Minimal.” It stated that that examination did not take into consideration the X-rays of the cervical spine taken on the same daté and'that the examiner had failed to look over these X-rays. It was the opinion of the neurologist that, if the prior examiner had looked at the X-rays, there might have been a difference in his diagnosis, for syringogliosis was hot really present. He further indicated that, while the plaintiff’s condition had remained static since the last examination, there was a difference in the diagnostic approach used by him.
The examiner found there was sufficient pathology in the bodies of the fifth and sixth cervical vertebrae to cause pressure on one of the nerves which forms the major part of the brachial plexus and was of sufficient intensity to warrant secondary loss of function of left arm and hand. The special X-ray report of that examination indicated,, inter alia:-
*1020 Ee-examination of the cervical spine shows no change in the moderate hypertrophic changes on the adjacent surfaces of the bodies of the 5th and 6th cervical vertebrae since October. 16, 1947. Oblique views show a moderate spur arising from the superior-posterior angle of the body of the 6th cervical vertebra.
Plaintiff’s condition was diagnosed as:
Neuritis, brachial plexus, left, secondary to arthritic changes in the bodies of the fifth and sixth cervical vertebrae, manifested by diminution of function of the left hand and occasional sensory disturbances.
The accompanying rating sheet gave plaintiff a 80-percent disability rating due to neuritis secondary to arthritic changes in the fifth and sixth cervical vertebrae and 10 percent due to the retained shell fragment in the right knee.
24. Plaintiff tendered a resignation of his commissions on July 10, 1950, for inability to carry out the duties of his rank in his mos because of moderately severe arthritis of the cervical spine and partial brachial palsy. The resignation was returned without action as none were being accepted at the time .except for extreme compassionate reasons. The Korean War had just started.
25. In July 1950 plaintiff was examined by Dr. William D. Holden, professor of surgery at Western Eeserve University and a renowned specialist on neck and shoulder girdle injuries. For the first time a diagnosis, which Dr. Holden termed an impression, was made of a herniated cervical disc or nucleus pulposus with resulting traumatic arthritis. Dr. Holden also believed that the herniated disc was probably secondary to a fracture of the cervical spine and urged plaintiff to see a competent neurosurgeon who could confirm such diagnosis by laboratory studies. Dr. Holden also noted that an X-ray examination of the cervical spine showed marked collapse of the fifth intervertebral disc with a marked amount of arthritis in the immediate vicinity.
26. As a result of a Veterans Administration examination on October 31,1950, plaintiff’s disability rating was increased to 50 percent, effective October 5, 1950. The surgical and neurological diagnosis on this examination for the first time stated in the Veterans Administration records that plain *1021 tiff had a herniated intervertebral disc with arthritic and nerve involvement in the region of the fifth and sixth cervical vertebrae, manifested by pains in the neck, left shoulder and arm. This confirmed Dr. Holden’s diagnosis.
Plaintiff is still rated 50-percent disabled, his last examination having taken place on November 29, 1960.
27. As a result of an Officer Reserve Corps physical evaluation program examination on April 24,1951, when plaintiff was 42 years of age, he was found disqualified for general duty. By letter dated October 3, 1951, the headquarters of the Ohio Military District, Fort Hayes, Ohio, advised plaintiff that the reason for his disqualification was a permanent physical defect described as “Cervical disk following fracture 5th and 6th C Vert with disability.” Plaintiff was further advised in the fall of 1951 that such finding made it necessary for him either to be transferred to the Honorary Reserve or discharged from his commission. It was requested that plaintiff indicate his desire by endorsement thereon. The plaintiff indicated that he desired to be discharged from his commission in the United States Army Reserve. Accordingly, on December 26, 1951, plaintiff was honorably discharged from his commission in the United States Army Reserve and the Army of the United States (Temporary).
28. Plaintiff had stated in the medical history portion of the April 24,1951, examination that the cervical disc condition, which the examination confirmed, had existed since his injuries on D-Day (June 6, 1944) at Normandy. Because plaintiff had been separated from active service not by reason of physical disability, no action was taken then (1945) or in 1951 by the Army to determine whether or not plaintiff was entitled to disability retirement benefits and he was given no advice thereon by defendant prior to 1958 as hereafter shown.
29. In July 1951 Dr. W. E. Brogden made a complete orthopedic examination of plaintiff, including a cervical X-ray. He arrived at a diagnosis of a compression fracture of cervical body 5 demonstrated by the neuro-joint space on the X-ray. On the basis of his clinical findings his conclusion was that there was pressure on the nerve root by reason of the *1022 fragmentation of the intervertebral disc. His preoperative diagñosis 'was “Cervical disc.”
Because of plaintiff’s pain and his difficulty in performing surgery and as a result of the clinical findings, Dr. Brogden, on August 2,1951, performed a cervical laminectomy upon plaintiff in which he excised the right side of the lamina of the posterior arch of C-6 and resected or removed the hy-pertrophic ligamentum flavum or ruptured disc between C-5 and C-6. Such a spinal operation is extremely dangerous and employed only as a last resort.
The danger in a cervical laminectomy is that there will be an infection as a result of such operation and, if so, it is usually fatal. This is because of anatomical proximity to the brain. Dr. Brogden’s postoperative diagnosis was, to the extent pertinent here, “Cervical disc and tract lamina C5, C6 resected” and—
(1) Fracture, incomplete, closed. Compression cervical 5C.
(2) Arthritis, severe, progressive C5-6.
(3) Disc fragmentation C-5-6, and * * *.
. 30. After plaintiff’s cervical laminectomy he obtained relief for approximately 16 months. Then, gradually, the symptoms began to reappear and became progressively worse. The operation could not do anything for the arthritis or for a fracture, which if it existed was already healed, but was for the purpose of relieving pressure upon the nucleus where it was impinging upon the nerve. The return of the symptoms indicated either that the nucleus had rehemi-ated or that the osteoarthritic process was more aggravated and more bone had grown. This caused pressure and pain. The operation did not relieve the stiffness in his neck, but did give plaintiff relief temporarily, as indicated, of the symptoms concerning his hands.
31. Plaintiff learned of his possible right to disability retirement in a chance encounter with a retired officer who so advised him in May 1958. Plaintiff addressed a letter to the Adjutant General, Department of the Army, on November 18,1958, alleging that he had never been advised by the Army of the extent of his rights arising from injuries said *1023 to have been suffered as a result of a shell fragment wound and fracture of the fifth and sixth cervical vertebrae at the landing in Normandy. He stated that he made complaints as to his condition while on active service but was not advised of the true nature of his injuries until he sought medical advice and treatment in civilian life and as subsequently confirmed by the Veterans Administration. Plaintiff concluded his letter of inquiry as follows:
I would appreciate it if your office would inform me as to what my rights are under present Army regulations, with the thought in mind of getting my Army discharge changed to a disability retirement.
32. In reply to the foregoing inquiry, the Adjutant General advised plaintiff on December 9, 1958, that in view of the fact he was separated' from the service not by reason of physical disability, the Army Board for Correction of Military Eecords was the only agency with authority to give further consideration to his case in the event there had been an error or an injustice. The letter concluded with this statement:
4. The Army and Veterans Administration operate under different laws in cases involving physical disability. Although the Army now uses the Veterans Administration standard schedule for rating disabilities. Army findings are based on the ability of the individual to perform the duties of his office, rank or grade at time of separation.
33. On March 26, 1959, plaintiff filed an application with the Army Board for Correction of Military Eecords asking that his discharge be changed to reflect “Discharge or retirement due to disability.” He alleged disability due to wounds incurred in l.o.d. while on active service, that he had reported inability to perform the duties of his rank and grade while still on active duty, that he was not informed of his rights and should be retired for disability, and that he was receiving a veteran’s pension for his condition. He alleged that he was given incorrect advice while in the service concerning his physical condition, the true nature of which was hot established until he returned to civilian life. Plaintiff indicated a desire to appear before the board with counsel but that he did not desire to present witnesses in person.
*1024 34. On July 22, 1959, the Correction Board requested the Surgeon General to review plaintiff’s application and medical records and to furnish a comprehensive opinion to guide the board regarding the medical issues. The Correction Board also requested the Surgeon General’s opinion regarding any error or injustice in the medical aspects of the case and to comment on the advisability of having plaintiff appear before a medical or physical evaluation board for a determination of. the issues involved. The Surgeon General replied to the Correction Board on August 14, 1959. That reply is set forth below in its entirety:
1. Eecords in the case of william r. parrar, 01 693 351 have been reviewed in this office.
2. On D Day 1944 this former medical officer received shell fragment wounds apparently of the soft tissues only, involving the right leg and lumbar region, mild in nature, resulting in no fractures, the officer remaining ambulatory, and returning to duty in 8 days. At the time of his wound he allegedly fell to the ground with great force resulting in the subsequent development of a herniated cervical disc.
3. Following his return to duty he claims to have complained of some cramping of the hands and pain in the neck but continued to perform duty. He was separated on points in December 1945. Following separation he returned to the civilian practice of surgery which he appears to have continued to date in a successful manner.
4. Since his separation from service it has been determined that he probably has a herniated disk in the cervical region. He has been awarded compensation by the YA on the basis of 40 and 50% disability for the disk syndrome and old wound and to date has received approximately $14,000 in compensation for these conditions.
5. It is quite clear from the evidence of record that assuming that the cervical arthritis and possible disk degeneration is a secondary result' of wounds of the leg, the symptom complex was of such mild nature as to not be unfitting for further military service. Also, the fact that he has been able to meet the physical demands of a civilian practice of surgery provides definite evidence that he could have continued indefinitely as a medical officer in active service.
*1025 6. The opinion is expressed that the evidence of record fails to support this contention of error or injustice and that this applicant presented .no physical disorder which would have warranted his retirement for physical disability-in 1945.
35. The Surgeon General’s reply of August 14, 1959, contains some statements subject to question in light of the evidence.
(a) Part of the first sentence of paragraph 5 of the Surgeon General’s opinion is patently erroneous. In that paragraph, the Surgeon General’s representative, Colonel Opsahl, assumed that the cervical arthritis and possible disc degeneration were secondary results of wounds of the leg. Manifestly this is neither what, the plaintiff alleged nor does it seem even possible that trauma in the region of the fifth through seventh cervical vertebrae would be secondary to leg injuries. The opinion of the Surgeon General’s representative that the symptom complex was then of such a mild nature as not to be unfitting for further military service, in view of his assumption, is thus extremely doubtful. The Surgeon General’s representative further asserted in paragraph 5 that “the fact that he has been able to meet the physical demands of a civilian practice of surgery provides definite evidence that he could have continued indefinitely as a medical officer in active service.”
Plaintiff submitted, in conjunction with a letter for reconsideration of the board’s denial of his application (see finding 38), affidavits asserting that surgeons of ability comparable to plaintiff’s earned in excess of $50,000 per year. Plaintiff’s income was alleged not to be equal to surgeons of comparable ability because of his inability to utilize his capabilities continuously in performing the same volume, of surgery as other surgeons.. Plaintiff’s precise and full income for any year since 1945 is not in evidence. Plaintiff’s income in 194T, two years after his release from service, was approximately $2,000 per month. At that time plaintiff’s expenses averaged about 35 percent of his gross income., or approximately $8,400 per year, thus leaving a net income of about $15,600. Before entering the military s.eryice plaintiff’s earnings averaged around $12,000 per year.
*1026 (b) Colonel Opsahl also stated in paragraph 1 of his letter that plaintiff’s D-Day injuries resulted in no fractures. The ¿vidence shows a possibility of a compression fracture.
(c) Colonel Opsahl also asserted that plaintiff remained ambulatory and returned to duty in 8 days. The evidence, however, shows that such was not correct. Plaintiff did not perform duty for more than a month after his injury (finding 7). Colonel Opsahl also stated plaintiff claimed he had cramping of his hands and pain in his neck, but continued to practice surgery. The evidence establishes that plaintiff greatly restricted his practice because of the considerable handicap of pain, that in November 1944 plaintiff sought assistance at the 45th Evacuation Hospital (finding 8) for such pain, and that plaintiff complained of troubles in his hands when he was examined July 2, 1945, at the Miami Beach Redistribution Station (finding 9).
(d) No reference is made in’Colonel Opsahl’s opinion to the physical standards for disability retirement prescribed by the regulations and cited hereafter. Obviously, they would have been of assistance to the Correction Board in reaching its decision.
36. A copy of the Surgeon General’s opinion was seen by plaintiff since on January 20, 1960, he called attention to and rebutted that report in a letter by his attorney to the Correction Board seeking a hearing. On the same day plaintiff enclosed with this letter six affidavits and two statements by himself. In summary, plaintiff’s statements were as follows:
Plaintiff noted that evidence of his disability at first depended entirely on disclosure by him of his subjective symptoms of severe pain and numbness and limitation of motion; that his subjective symptoms were not disclosed at the time of his separation because of the element of neuroticism which had been implied at the time he reported the complaint to Colonel Feder at the 45th Evacuation Hospital in 1944; that in order to escape the onus associated with such a label, he had continued to work under the handicap of severe pain and numbness in both hands; and that, in addition, the Army Medical Department had sent him back to duty without disclosing the true nature of his injuries and had let him accept *1027 the opinion, that he either imagined his symptoms or that they were dne to exposure to severe cold.
Plaintiff also claimed that, in addition to the- shell fragments which entered his body, he had sustained a severe concussion and- that he had complained, to the Navy medical officer on the lst upon which he had been transported to England as a casualty, of severe headaches and inability to move his neck and that he had reported the same complaints to the Army medical officer at the general hospital in England ; that wounds caused by the shell fragments were treated but that at no time was any attention given to his complaints regarding his head and neck; that he was in bed several days at the general hospital and that he was then placed in an ambulance by his executive officer and transported to his own headquarters; that during his convalescence, and for several months thereafter, his neck was rigid and fixed by spasms of the neck muscles and that the spasticity persisted for about 3 months, after which it had subsided although he had never regained normal and full range of motion in his neck.
Plaintiff also noted his Veterans Administration examination in Cleveland, Ohio, which found his symptoms connected to his D-Day injury, whereby he was placed on pension and that upon subsequent re-examination for continuance of his commission he had been found to be permanently physically disqualified and his commission terminated. He also noted that the Veterans Administration had refused to grant him a waiver of premium for disability on his life insurance when he applied for it in 1956.
Plaintiff also asserted that, although an operation was performed in an attempt to obtain relief, his symptoms have become progressively worse; that he works with excruciating pain; that he has to arise at least an hour earlier than necessary to get enough circulation in his arms and hands; and that his wife helps him dress.
He further pointed out to the board that he was required to curtail his activities in reference to the actual performance of surgery and required to seek other sources of income not requiring the skills and training of a surgeon.
Among other things, plaintiff indicated that the reduction of his surgical activities was manifested by the fact that he *1028 makes no house calls; that Ms patients are seen mostly as referrals from other physicans; that he professionally sees patients only three or four afternoons a week; and that he had particularly limited the extent of his surgery by eliminating fractures and orthopedics, nose and throat surgery, proctologic surgery and emergency room work. He further indicated that he had to take frequent rest from surgery by maintaining a routine of not operating one week out of every two or three.
37. The six affidavits submitted by plaintiff with his own statement, summarized in the finding above, substantiated his contentions as to his physical condition, the cause thereof, and the fact that he has continuously experienced pain in his hands, shoulders and neck from the time of his injury on D-Day (June 6,1944); that the discomfort has become worse through the years; that he has undergone a dangerous cervical laminectomy in a futile attempt to gain permanent relief; that his surgical practice has suffered on account of inability to continue full surgery on account of his condition; and that he has attempted tó keep his condition from the public because of possible detrimental effect such knowledge might have on his practice.
The affidavits were by Dr. Murray W. Scott, Jr., who served with plaintiff at Fletcher General Hospital in the summer of 1945 after plaintiff’s return from the European Theatre of Operations; Dr. W. E. Brogden, the surgeon who performed the operation on plaintiff and who had known Mm since 1944; Dr. Raymond S. Rosedale, who had known plaintiff since 1937 and who knew that he suffered from no such disabilities prior to his military service; the chairman and staff anesthesiologist of the Department of Anesthesiology of Aultman Hospital, Canton, Ohio; the supervisor and assistant supervisor of surgery at Aultman; and plaintiff’s office assistant, Mildred B. Shirley, R.N.
38. Plaintiff was notified by a letter dated February 2, 1960, that on January 27, 1960, the Correction Board had determined that insufficient evidence had been presented to indicate probable material error or injustice and that his application had been denied. Plaintiff then submitted additional affidavits and a letter “in the nature of a request for *1029 reconsideration” to the Correction Board on November 2, 1960. The affidavits included those pertaining to plaintiff’s earning capacity in relation to surgeons of comparable ability referred to in finding 35 and were contrary to the statement of Colonel Opsahl in paragraph 5 of his opinion on which the Correction Board relied (finding 34) that plaintiff had “been able to meet the physical demands of a civilian practice” thus providing “definite evidence that he could have continued indefinitely as a medical officer in the active service.” However, the prior decision was confirmed by the board on January 4,1961.
The executive secretary of the Correction Board indicated by letter that it had been determined that if the additional information submitted by plaintiff had been available when the case was initially reviewed on January 27,1960, it would not have altered the decision of the board to deny plaintiff’s application without a formal hearing.
The Correction Board was the first and only board whicn has considered plaintiff’s application for disability retirement pay.
39. There is no question in this case concerning line of duty. So far as the trial of the merits of this case is concerned, there was one issue, i.e., the condition of plaintiff at the time he was released from military service. Objectively, on the basis of the medical records then in existence, plaintiff was physically fit to perform duty at the time of his release from active duty on December 29,1945.
40. The causal element or connection between plaintiff’s D-Day injury and his subsequent symptoms and condition is, of course, sharply controverted. The weight of the credible evidence, however, indicates the following:
(a) A violent fall, such as plaintiff said he experienced on D-Day, could have caused a herniated disc of the fifth and sixth cervical vertebrae, or a compression fracture. A compression fracture cannot be found in the cervical vertebrae, absent a traumatic episode.
(b) It is not necessarily true that a person who had a compression fracture would simultaneously suffer a herniated disc. The latter could be caused by the former. The herniated disc could also be caused by a subsequent degeneration *1030 and fragmentation resulting from the trauma and taking place over the same period of time as hypertrophic arthritic changes were taking place. A compression fracture itself, without herniation of the disc and without arthritis, would be unlikely to cause the numbness in the hands, absent force sufficient to cause paralysis. In a compression fracture, a vertebral body is squashed or flattened. In the process of repair excess bone tissue is formed. This excess is a sort of spur which projects outward and is arthritis. It causes pain and can impinge on a nerve and cause a limitation of motion, muscle spasm and stiffness. The arthritis is secondary to the compression fracture. Fractures almost always result, eventually, in arthritis.
(c) Spurring can be caused by accident or a response to degenerative arthritis. It can also be in response to a spontaneous collapse of a disc in an inner space. It is a response which is nonspecific, indicating irritation of the bone either presently or at some time in the past. It takes time. A spur would not be seen on an X-ray until at least 4 to 6 months after an episode which would cause a spur, or it could take years to develop.
(d) A herniated or ruptured disc could have impinged upon the nerves having roots in the region of cervical 5 through 7. When a disc ruptures the cartilaginous material protrudes through its fibrous sac exerting pressure on the nerve roots. A disc pressing on a nerve root may or may not cause reflex changes. The same thing holds for a spur.
(e) A compression fracture, a herniated cervical disc between C-5 and C-6, or arthritis could have caused pain and stiffness in plaintiff’s neck with or without impingement upon the nerves. The weight of evidence does not support the finding of a compression fracture but does establish that plaintiff was suffering from the other two conditions at the time of hi's operation in 1951. His discharge from the Be-serves followed.
(f) X-rays sometimes fail to show a herniated disc or a compression fracture. It is not always possible to tell that such conditions exist until surgery. In this case, X-rays in 1947 suggested only spurring with the consequent pressure on nerves and discomfort and disability of arthritis. These are *1031 the earliest X-rays of plaintiff’s cervical spine subsequent to his D-Day injury. Plaintiff never was subjected to myelo-graphic procedures to determine the condition of his spine.
(g) Plaintiff never had any kind of injury to his neck which could have accounted for fractured vertebrae,- either prior or subsequent to his military service. Plaintiff did not have any symptoms in his hands or neck, arms or shoulders prior to D-Day.
(h) Plaintiff’s complaints, particularly as to the numbness in his hands, commenced shortly after D-Day and have continued, apparently with increasing intensity ever since. The symptoms appearing in plaintiff’s hands shortly after the D-Day episode at Omaha Beach indicated that the disc could already have ruptured, but that the fracture itself did not necessarily cause it.
(i) The average age of a patient with a hernia of the nucleus pulposus is approximately 40 years. At 35 years of age there are no degenerative changes. Such changes, however, do set in after age 40. Arthritis can come about as a result of traumatic fractures or not. It is a disease which produces the dissolution of the continuity in bones. Such a condition is a pathological fracture. Such changes after age 40, however, are all over, or at minimum throughout the ■entire cervical region, and are not limited to a particular joint, space or area unless there has been a traumatic injury to it. Plaintiff was 35 years of age in 1944.
(j) There is no conclusive evidence that there was a herniated disc in 1947. If so, the same would be true of earlier periods. However, the pressure on plaintiff’s nerves, beginning in the cervical region and traveling through the brachial plexus of the shoulder and down the arms, hands and fingers, was caused in this case either by a compression fracture or a herniated disc or arthritis secondary thereto. The weight of the credible evidence is that a herniated disc was present in 1947, though not diagnosed as such, and that it occurred as a result of a trauma. The only evidence of a trauma that could have caused such a rupture arises from plaintiff’s alleged fall on the beach on D-Day.
*1032 THE REGULATIONS
41. Paragraph 30, AB 605-250 (1944) and paragraphs 23 and 60a(2) and d{4) of the War Department Technical Manual 12-245 (1945) provide that an officer is disabled and entitled to disability retirement pay under the act of April 3, 1939 (53 Stat. 557) if he is permanently incapable of performing full military duty, field or garrison, in both peace and war. Examinations are required by AB 140-5 (1941) to determine the physical fitness of officers for appointment, retention, promotion or separation from military service. Under paragraph 105 of AB 140-5 and paragraph 20 of AB 605-10 (1944) the physical standards of AB 40-105 (1942) apply in determining whether an officer is physically fit for retention. Paragraphs 47 and 52 of the latter provide that officers with herniated nucleus pulposus or history of operation for the same or healed fractures or dislocations of vertebrae or osteoarthritis of the spinal column or neuritis are disqualified.
42. The Surgeon General has a publication entitled “Manual for Officers in the Disposition and Betiring Board Branch of the Physical Standards Division of the Surgeon General’s Office.” The manual sets forth certain standards used in adjudicating applications for retirement by reason of physical disability. Paragraph 36 thereof interprets the regulations to provide that herniation of nucleus pulposus is usually considered incapacitating for general military service. A distinction is drawn, however, between persons having such disability and those who have been operated on for the same. In the latter case, in the absence of symptoms following surgery, such an officer could be placed on 6 months’" temporary limited service and then could be subjected to subsequent re-examination and re-evaluation at the end of the period. Paragraph 61 of the manual provides for similar consideration for cases where the fracture of the vertebra is slight and there are no symptoms.
43. AB 15-185, July 18, 1955, entitled “Boards, Commissions and Committees — Army Board for Correction of Military Becords,” provides:
10. Beview of application. Each application and the available military or naval records pertinent to the cor *1033 rective action, requested will be reviewed to determine whether to authorize a hearing or to deny the application without a hearing. The Board will make this determination in all cases except those in which the application has been denied administratively for the reason that the applicant has not exhausted all other effective administrative remedies available to him. In connection with any application which it considers, the Board may recommend to the Secretary that the records be corrected, as requested by the applicant, without a hearing. The Board may deny an application if it determines that insufficient evidence has been presented to indicate probable material error or injustice, that the applicant has not exhausted other effective administrative or legal remedies available to him, or that effective relief cannot be granted. The Board will not deny an application on the sole ground that the record or records involved were made by or by direction of the President or the Secretary in connection with proceedings of a board for correction of military or naval records. If the application is denied, the applicant will be advised of the denial and that he is privileged to submit new and material evidence for consideration.
# * & if!
2T. Staff assistance, a. At the request of the Board, The Adjutant General will assemble the original or certified copies of all available military records pertinent to the relief requested. Such records and all supporting papers will be transmitted to the Board.
o. The Board is authorized to call upon the Office of the Secretary of the Army and the Department of the Army General and Special Staffs for investigative and advisory services and upon any other Department of the Army agency for assistance, within the specialized jurisdiction of that agency.
ULTIMAIH FINDING
44. The weight of the evidence establishes that on June 6, 1944, at the landing on Omaha Beach, Normandy, France, plaintiff suffered a trauma and a herniated nucleus pulposus, or so-called ruptured disc of the cervical spine. He complained of symptoms which arose from this injury but was not adequately examined therefor while in the military service nor was the fact of the injury then established. He was *1034 misled by tbe advice received from Army medical examina* tions suggesting neurosis as tbe cause of his symptoms. Plaintiff was separated from the service, not for disability, on December 29, 1945, and was offered no board hearing or advice on disability retirement benefits. At the time of his separation from the service he did not complain of his condition, in- part because of the misleading information he had received. Had he complained at the time of his separation, and had an adequate examination been accorded him and X-rays then been made, it is questionable if his condition could have been established with certainty. Diagnosis of such a condition is very difficult as X-ray frequently fails to disclose it.
It grew progressively worse, however, and by 1947 there were fairly clear indications of the cause of his trouble which were confirmed by two examinations in 1950 and by an operation in 1951. Plaintiff has been rated by the Veterans Administration for a service-connected disability to his spine since 1947.
The arthritis arising from the trauma, the herniated disc, effects therefrom and operation therefor, are permanently disabling for full military duty. Had the true facts of plaintiff’s condition been known at the time of his separation from the service in 1945 he would have been entitled to disability retirement under applicable Army regulations. The failure or refusal of the Army Board for the Correction of Military Records to. accord plaintiff a hearing when it had before it evidence which indicated probable error or injustice and would have established the foregoing facts, its reliance upon and concurrence with erroneous advice of the Surgeon General and refusal to correct plaintiff’s military record was arbitrary, not supported by substantial evidence, contrary to the evidence and in disregard of the applicable Army regulations.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47 (c).
*1035 In accordance with the opinion of the court and a memorandum'report of the commissioner as to the amount due thereunder, it was ordered on May 2,1966, that judgment for the plaintiff be entered for $33,419.88.

 As in Harper, the present plaintiff’s cause of action did not accrue until denial of his claim by the Correction Board. He did not previously have or ask for a retiring board, nor was he offered one. There is no limitations bar. Accord: Grubin v. United States, 166 Ct. Cl. 272, 333 F. 2d 861 (1964); Woodard v. United States, 167 Ct. Cl. 306 (1964).

Plaintiff was born in Italy on January 2, 1909, ana became a naturalized citizen of the United States in 1SS8. His military service records in evidence identify him as William Rosario Ferraro. In 1950 he changed his name to William Ross Farrar. There is no issue concerning proper relation of the records to the plaintiff.